BURKE & *a. v.* CONCORD RAILROAD & *a.*

The interpretation of a railroad charter, like the interpretation of any other grant, statutory, contractual, or testamentary, is the ascertainment of intention, and the question of intention is a question of fact to be determined upon competent evidence.

The general rule, that a grantor intends, if he is able, to convey the rights and powers without which the grant would be of no effect, or the means reasonably necessary for the enjoyment of the granted property or right, the exercise of the granted power, and the accomplishment of the object of the grant, is applicable to the charter of a railroad.

The charter of the Concord Railroad shows that the grantor and grantee intended the grantee's road should be not a detached and isolated road, but one of several connected roads forming a line between Concord and Boston.

The Concord Railroad Corporation is authorized to make, with the Nashua & Lowell Railroad Corporation, such a business connection as will give the public the accommodation of a continuous line from Concord to Boston, but not to form a general partnership with the Nashua & Lowell for the operation of their roads by both corporations as joint principals.

The stipulations of a certain contract made by those corporations *held* to be an unauthorized formation of such a partnership.

BILL IN EQUITY, by stockholders of the Concord Railroad Corporation, for an injunction against the performance of a contract made by that corporation and the Boston & Lowell Railroad Corporation for a joint management, for five years, of the line of railroads running from Concord through Nashua and Lowell to Boston.

[COPY OF THE BILL.]

Merrimack ss.        To the Supreme Court.

Edmund Burke, of Newport in the county of Sullivan; Edward L. Knowlton, Eliphalet S. Nutter, Horatio G. Belknap, Bradbury Gill, Charles Hall, John H. Pearson, and Charles C. Pearson, all of Concord in said county of Merrimack; Smith S. Page, of Hopkinton in said county of Merrimack; Caleb Page, of Dunbarton in said county of Merrimack; and E. H. Spalding, of Nashua in the county of Hillsborough,—complain against the Concord Railroad, a corporation duly established according to and existing under the laws of the state of New Hampshire, and having its principal place of business at Concord aforesaid; and Frederick Smyth and Samuel N. Bell, both of Manchester in the county of Hillsborough; J. Thomas Vose, of Boston in the county of Suffolk and commonwealth of Massachusetts; Benjamin A. Kimball and

Henry C. Sherburne, both of Concord aforesaid; and James W. Johnson, of Enfield in the county of Grafton in the state of New Hampshire,—all of whom are directors of said Concord Railroad; and Francis B. Hayes, of Boston aforesaid, who is enjoying and exercising the powers, privileges, and franchises of a directorship in said Concord Railroad; the Boston & Lowell Railroad, a corporation duly established by and existing under the laws of the commonwealth of Massachusetts and having its principal place of business at Boston aforesaid; and the Boston, Concord & Montreal Railroad, a corporation duly established by and existing under the laws of the state of New Hampshire, and having its principal place of business at Plymouth in the county of Grafton; and the Northern Railroad, a corporation duly established by and existing under the laws of the state of New Hampshire and having its principal place of business at Concord aforesaid, and say,—

That they, the said plaintiffs, are stockholders in said Concord Railroad, owning and holding in their own right, respectively, shares of the capital stock of said Concord Railroad, as follows: Edmund Burke, sixty-six shares; Edward L. Knowlton, three hundred shares; Eliphalet S. Nutter, one hundred and sixty-two shares; Horatio G. Belknap, one hundred and nine shares; Bradbury Gill, forty-three shares; Charles Hall, fifteen shares; Charles C. Pearson, two hundred and ninety-one shares; John H. Pearson, eighteen hundred and thirty-eight shares; Smith S. Page, forty-six shares; Caleb Page, sixty-one shares; and E. H. Spalding, one hundred and six shares;—and they make this complaint as well in behalf of all other stockholders in said Concord Railroad, except the defendants, as in behalf of themselves;

That the railroad of said defendants, the Concord Railroad Corporation, is thirty-five miles in length, and for a long time has been, still is, and of necessity must continue to be, a necessary and natural outlet for the traffic of the said Northern and Boston, Concord & Montreal railroads and their respective branches, and by reason thereof the said Concord Railroad, up to the time of the acts done and agreement and contract made and entered into by the defendants, as hereinafter complained of, had earned large sums from said traffic, and from which ought to have inured good profits to its stockholders;

That said defendants, or some of them, as the plaintiffs are informed and believe, have but little direct pecuniary interest in the stock or successful operation of said Concord Railroad, while all or nearly all of them have large interests in the stock, successful operation, and profits of other and rival railroads, viz., the said Boston & Lowell, Boston, Concord & Montreal, and Northern railroads, the interests of which are adverse to the interests of said Concord Railroad and its stockholders, and they, said defendants, were elected or declared to be elected directors of said Concord Railroad, at its last annual meeting, on account of their known

interest in and partiality to said other and rival railroads, whose interests were and are adverse to the interests of said Concord Railroad and its stockholders as aforesaid;

That the said defendants, Smyth, Bell, Vose, Johnson, Sherburne, Kimball, and Hayes, holding and representing interests adverse to said Concord Railroad and its stockholders, and contriving and designing to protect, improve, and enhance in value and increase the profits of said adverse interests, and contriving and designing, as said plaintiffs believe, to injure said Concord Railroad and its stockholders, and to decrease its and their legitimate profits and depreciate the value of its stock, and to give to other railroads, and those having adverse interests, the benefits and profits derived from its advantageous location, and without the consent of the stockholders, and in direct violation of the public law of New Hampshire and the charter and by-laws of said Concord Railroad, did, on August 19, 1881, in the name of said Concord Railroad, make and enter into a contract with the said Boston & Lowell Railroad, which is a foreign corporation, the terms, stipulations, and provisions of which contract are injurious to the interests and destructive of the rights and property of the Concord Railroad, and are unwarranted by the public law of said state of New Hampshire and the charter of said Concord Railroad, and, if permitted to be carried out, must, as the plaintiffs believe, result in the material decrease of the profits and the depreciation in value of said Concord Railroad, and therefore work great injury to the rights, property, and interests of the stockholders of said Concord Railroad;

That said defendants, Bell, Smyth, Vose, Johnson, Kimball, Sherburne, and Hayes, assuming to act as directors of said Concord Railroad, authorized, or attempted to authorize, the said defendant, J. Thomas Vose, to sign and seal said contract by a vote passed August 19, 1881, a copy of which is as follows:

"On motion, voted, that the president of this corporation be authorized to affix the corporate name and seal to the agreement with the Boston & Lowell Railroad for a joint operation of the two railroads for five years from September 1, 1881."

And said defendant, J. Thomas Vose, did sign and seal said contract, a copy of which is hereunto annexed, marked "A;"

That said contract contemplates and provides for the transfer of "the entire control" of said Concord Railroad and its "shops, depots, furniture, rolling-stock, machinery, tools," and its other property used in its operation, from its directors to "a general manager, who shall be chosen by the concurrent vote of a majority of the directors of each party," which is a management and delegation of authority which are neither recognized in or authorized by the charter of said Concord Railroad, which was granted by the legislature of New Hampshire, June 27, 1835; because section two of said charter provides that "the immediate government and

direction of the affairs of the said corporation shall be vested in seven directors," chosen by the corporation annually, and not in an authority selected by a foreign corporation, as provided for by said contract in articles two and nine;

That under said contract "the care and custody of the finances" of said Concord Railroad are "to be confided to a cashier," in the choice of which said foreign corporation participates, and who is, or is to be, as the plaintiffs are informed and believe, a citizen of the commonwealth of Massachusetts, and therefore beyond the jurisdiction both of the courts and legislature of New Hampshire, and who is also, as the plaintiffs are informed and believe, a stockholder in and an officer of said foreign corporation, while said section two of said charter provides for "a treasurer, who shall give bonds to the corporation with sureties, to the satisfaction of the directors, in a sum not less than twenty thousand dollars, for the faithful discharge of his trust;" and article seven of the by-laws of said corporation, adopted July 7, 1841, defines the duties of the treasurer of said corporation as follows:

"The bond of the treasurer shall be for a sum not less than thirty thousand dollars, and be in the custody of the president. It shall be the duty of the treasurer to collect all instalments, safely to keep the seal of the corporation, and all the moneys, securities, and valuable papers; to disburse and deliver over the same as the directors shall require; keep his books and accounts in an approved form, showing the true condition of the finances and funds of the corporation";

That, notwithstanding these provisions of the charter and by-laws of the Concord Railroad, the defendants have transferred and are transferring all the moneys and earnings of said Concord Railroad from the hands and possession of the treasurer, agents, servants, and employés of said Concord Railroad to the possession and custody and into the control of said cashier, who is a citizen of Massachusetts and beyond the control and jurisdiction of the courts and legislature of New Hampshire, to the great injury and prejudice to the rights of said stockholders, and in direct violation of said charter and by-laws and the public laws of said state of New Hampshire, and also in violation and disregard of a perpetual injunction made by the circuit court of New Hampshire at its October term, 1875, for Merrimack county aforesaid;

That under article nine of said contract, the "general manager," who is to be "chosen by the concurrent vote of a majority of the directors of each party," "may be removed" by the unanimous vote of the directors of said foreign corporation, and so said Concord Railroad directors cannot prevent it, even if they desired it, and the interests of the Concord Railroad and its stockholders required it, and thus the immediate direction of the affairs of said Concord Railroad Corporation, which, by said section two of said charter of said Concord Railroad, are vested in seven directors

chosen by the members of said Concord Railroad, is, by said article nine of said contract, taken from them and committed to the control of the directors of said foreign corporation, in direct violation of the charter of said Concord Railroad as prescribed in section two, and in violation of the public law of said state of New Hampshire, and which must result, if permitted to continue, in the great and irreparable injury to the rights, interests, and property of the stockholders of said Concord Railroad, by placing its control and management in the hands of the directors of a foreign corporation, whose interests ·are adverse to the interests of said Concord Railroad and its stockholders ;

That the "cashier," to whom the "care and custody of the finances" of said Concord Railroad are committed by article ten of said contract, may be removed without the consent of the Concord Railroad or its directors, providing his removal is desired and voted by all the directors of said Boston & Lowell Railroad, which would result in the change of the custodian of the funds of said Concord Railroad without the consent of the directors or stockholders, which is, as the plaintiffs believe, a clear violation and perversion of section two of the charter of said Concord Railroad and article seven of the by-laws thereof and of the public law of the state of New Hampshire, and injurious to the rights and interests of the Concord Railroad and its stockholders ;

That under said contract said Concord Railroad is deprived of the right and privilege of making any changes in the local or through rates for transportation over its road as they existed on said August 19, 1881, except with the approval of said foreign corporation, that is to say, as stated in article eleven of said contract, "without the approval of the directors of the local road so interested and the joint management,"—thus in this particular, too, taking from said Concord Railroad directors the "immediate government and direction of the affairs of said corporation" and putting them into the control of a foreign corporation and its directors ;

That, by article twenty-five of said contract all matters of disagreement under the contract are to be "referred to the arbitration of three persons,"—Francis B. Hayes, one of said defendants, on the part of said Concord road; T. Jefferson Coolidge, on the part of the Boston & Lowell road; and a third to be chosen by these two,—and the "decision of a majority of whom shall in all cases be final and conclusive";

That said Hayes is selected to represent said Concord Railroad in said arbitration, although he has but merely a nominal interest, if any, in said Concord Railroad, while he has large interests, as the plaintiffs are informed and believe, in other and rival roads whose interests are adverse to the Concord Railroad, viz., the Northern in New Hampshire, and others in Massachusetts; and so in said arbitration the interests of the said Concord Railroad

would be intrusted to a party who is not impartial or interested for the Concord road, but who is directly interested adversely to it and its stockholders:—and consequently, as your complainants believe, no just and impartial adjustment of any differences in which the Concord road might be interested with the Boston & Lowell road could be had or expected, so far as the rights and interests of the Concord road were concerned;

That, by article six of said contract, additional leases or contracts for the operation of connecting railroads may be made by either party, if sanctioned and approved by both parties, which permits the Boston & Lowell Railroad and the directors of the Concord road, who are interested adversely, as hereinbefore stated, to lease roads to the Concord road in which they are interested, and pay a rent or income to such roads from such leases that would be greatly to the advantage of such roads, and much in excess of their real earnings, and without reference to the interests of the Concord road, and therefore by this means transfer and turn over to such other roads a portion of the profits and income of the Concord road, which of right belong wholly to the stockholders of said Concord road, and which should not be denied them; and such leases and contracts as are contemplated by this article of said contract are in violation of the charter of said Concord Railroad hereinbefore referred to, and in violation of the public law of New Hampshire;

That under said contract, said joint management must pay to said Boston & Lowell Railroad, for the use of the Massachusetts Central Railroad, twenty-five per cent. of its gross receipts, and pay the interest on the cost of the equipment of said Massachusetts Central road; and upon the termination of said contract, said joint management is to make an allowance for any depreciation, from use, of the said equipment, and this, too, without any reference whatever to the net earnings of said Massachusetts Central Railroad, so that even though its gross earnings are not sufficient to pay the cost of running it, said Concord Railroad must contribute to an income to the Boston & Lowell road for it, even though nothing is obtained from it;

That said plaintiffs further allege that said contract is in all respects, as well those not hereinbefore referred to as those to which they have referred, in violation of and unauthorized by the public law of New Hampshire and the charter of said Concord Railroad, as hereinbefore referred to, and must be, if permitted to be carried on, very injurious in its effects upon the rights and privileges of said Concord Railroad, and injuriously affect the value of its stock owned and held by its stockholders, and is a scheme and conspiracy entered into by said defendants for the purpose of taking a part of the earnings, profits, and advantages of said Concord Railroad from its stockholders, and giving them to said Boston & Lowell, Northern, and Boston, Concord & Montreal railroads, and

thereby rob said Concord Railroad of some of its legitimate earnings and profits, and also thereby decrease its income and depreciate the market value of its stock.

Wherefore said plaintiffs pray that said defendants, and their agents, servants, attorneys, and employés, may be forever enjoined from operating or in any manner meddling with the management of said Concord Railroad under said contract in any way; and that said directors of said Concord Railroad be required and ordered to resume the control and management of said Concord Railroad, in accordance with the provisions of its charter as hereinbefore set forth, and in accordance with the laws of the state of New Hampshire; and that in the meantime a receiver may be appointed to take charge of the management of said Concord Railroad pending litigation on this bill, or that the directors of said Concord Railroad be required and ordered to resume the control and management of said Concord Railroad during the pendency of such litigation, and for such other further or different relief as to said court may seem just.

|  |  |
|---|---|
| Edmund Burke, | Edward L. Knowlton, |
| Eliphalet S. Nutter, | Horatio G. Belknap, |
| Bradbury Gill, | Charles Hall, |
| John H. Pearson, | Charles C. Pearson, |
| Smith S. Page, | Caleb Page, |

E. H. Spalding.

By their solicitors,—

Bingham & Mitchell and W. J. Copeland.

## "A"

Contract between the Boston & Lowell Railroad Corporation and the Concord Railroad Corporation.

This memorandum of agreement, made this nineteenth day of August, in the year eighteen hundred and eighty-one, between the Boston & Lowell Railroad Corporation, a corporation duly established by the laws of the commonwealth of Massachusetts, of the first part, and the Concord Railroad Corporation, a corporation duly established by the laws of the state of New Hampshire, of the second part,—

*Witnesseth,* That whereas a large portion of the business of the roads of the parties hereto is a joint business, passing over the roads and through the hands of both parties, making desirable a common policy and unanimity of management; and whereas, in the transaction of said business there is a mutual interest in said parties, both as to the mode of transaction and as to the tariff upon the same, as well as in all other matters relating thereto; and whereas, said corporations, by operating said roads in common management, would thereby be enabled to do the said business with greater facility and regularity, and at a greater saving of

expense to both parties: Now, therefore, for the promotion of their mutual interest through a more efficient and more economical joint operation and management of the said roads, and for the better security of their respective investments as well as for the convenience and interest of the public, the said parties do hereby covenant and agree to and with each other, that for the term of five years from and after the first day of September, eighteen hundred and eighty-one, the Boston & Lowell Railroad and the Concord Railroad, including all branches, leased roads, and all roads operated and controlled by them, shall be worked and managed as one road, under the stipulations and conditions, and subject to the exceptions and limitations, as set forth in the following articles:

ARTICLE I. This indenture shall be construed as a business contract only, and in no sense as a lease of one road to the other, or as a union of their corporate powers or privileges, each party retaining to itself all of its chartered rights and liabilities, and the power to sue or liability to be sued, in its own separate name and capacity, in the same manner and to the same extent as heretofore, excepting that in so far as between these parties the rights and liabilities of one with the other shall be settled and determined by this agreement.

ART. II. The joint management herein provided for shall have, to be used in accordance with the provisions of this contract, the entire control of the roads of each party, their shops, depots, furniture, rolling-stock, machinery, tools, and other property necessary for the maintenance and working of the joint roads; also all lands and buildings, for whatever purposes used, within or without the location of the roads of each party, and others owned, leased, or operated by them; reserving only to the separate management such other property of each corporation as has been accumulated.

ART. III. All leases and contracts now existing with either of the corporations parties hereto as hereinafter stated, together with those for transportation, shall be assumed and carried out by these joint parties, and the receipts from the same during the continuance of this contract put into the joint income.

ART. IV. There shall be allowed from the joint earnings the following sums as rentals of roads so long as the same shall be operated and managed by the parties hereto during the continuance of this agreement, viz.,—

To the *Boston & Lowell Railroad,* on account of

Massachusetts Central Railroad, 25 per cent. of its gross receipts under its lease.

Middlesex Central Railroad, $15,000 per year, and 6 per cent. on cost of present extension.

Eastern Railroad, $4.800 per year.

Boston & Maine Railroad, $3,000 per year.

Nashua & Lowell Railroad, $65,000 per year.

Wilton Railroad, $14,130 per year.

Peterborough Railroad, 6 per cent. on cost of road, taxes, and $150 per year for organization expenses.

Stony Brook Railroad, 6 per cent. on capital stock, taxes, and $300 per year for organization expenses.

To the *Concord Railroad,* on account of

Manchester & Lawrence Railroad, $100,000 per year, and $1,600 for organization expenses.

Methuen Branch, $11,000 per year.

Concord & Portsmouth Railroad, $25,000 per year.

Suncook Valley Railroad, $14,550 per year, and $300 for organization expenses, and 6 per cent. upon the cost of the extension of the road from Suncook to Hooksett, according to the terms of the lease, whenever such extension shall be made.

Nashua, Acton & Boston Railroad, $11,000 per year, and $200 for organization expenses.

ART. V. Renewals of existing leases, or modifications of the same, may be made during the continuance of this agreement, provided the liabilities of the joint roads are not increased without the consent of both the corporations parties hereto, and any reductions that may be made in the above rentals shall accrue to the lessee of the road making such reduction.

ART VI. Such additional leases or contracts for the operation of connecting railroads may be made by either of the corporations parties hereto as may be deemed expedient; but no lease or contract so made shall impose any liability upon, or reduce the amount of, the joint income, unless the same shall be sanctioned and approved by both parties.

ART. VII. All contracts for supplies necessary for the operation and maintenance of the roads heretofore made by either party shall be assumed by the joint parties hereto and settled from the joint funds.

ART. VIII. Each party shall be separately liable for unsettled claims against it to the commencement of this agreement; but all liabilities growing out of or arising under this contract, and not specially excepted herein, shall be a charge upon the joint income.

ART. IX. The joint roads shall be operated and managed by a general manager, who shall be chosen by the concurrent vote of a majority of the directors of each party, and may be removed in like manner, or by the unanimous vote of either board; and the respective boards of directors shall, by such concurrent action, exercise the same control over the management as is usual with boards of railroad directors in ordinary cases.

ART. X. The care and custody of the finances of the joint management shall be confided to a cashier, who shall be chosen by the concurrent vote of a majority of the directors of each party, and may be removed in like manner or by the unanimous vote of either board; said cashier to give such suitable bond for the performance

of his trust as may be prescribed by the directors of each corporation.

ART. XI. No changes in the present local or through rates for transportation shall be made without the approval of the directors of the local road so interested, and the joint management.

ART. XII. The cars, engines, furniture, with stationary engines, tools in machine-shops, and for road repairs, shall be accurately inventoried and appraised by persons mutually agreed upon for this purpose, and be kept in equal comparative repair to their present state and condition; and any additions to the same, beyond what is necessary to cover depreciation, made during the continuance of the contract, shall belong to the respective parties in the same proportion as hereinafter agreed upon for the division of the joint income.

ART. XIII. The Boston & Lowell Railroad shall furnish and pay for the additional equipment required for the operation of the Massachusetts Central Railroad; and the interest on the cost of the same shall be paid from the joint funds. This equipment shall be kept by the joint management in good repair, and be at all times during the continuance of this agreement at the risk, from all causes, of the joint management; and upon the termination of this contract the joint roads shall make a proper allowance for any depreciation from use.

ART. XIV. A full inventory and appraisal shall also be made, by persons mutually agreed upon for this purpose, of all stock in the machine-shops, and for road repairs, coal, wood, oil, waste, rails, ties, and all operating materials on hand and owned by each separate party at the commencement of this contract; and the amount of such appraisal shall be charged to the current joint account, crediting to the respective parties the portion put by each into the common stock;—and on the termination of this contract all such stock and materials as shall remain in the hands of the joint management, together with any additions that may have been made thereto during the continuance of the same, shall be appraised, and the amount returned to each party that it contributed at the commencement of this agreement, any excess or deficiency from said amount to be shared by the joint roads in the same proportion as hereinafter agreed upon for the division of the joint income.

ART. XV. The road-bed, bridges, superstructure, depots, buildings, wharves, fixtures, and other property of each road shall be kept as near as may be in like relative repair to their present state and condition; and all casualties and damages to the same shall be at the common risk, and charged in the current joint account, except damage by fire as hereinafter provided for.

ART. XVI. The joint management shall provide proper insurance upon the bridges, depots, buildings, wharves, fixtures, and other property of the roads committed to its charge, payable to

the owners of the property, unless otherwise specially ordered; and in case of destruction or damage to any bridges, depots, buildings, and fixtures, so insured, by fire, the party owning or leasing the same shall proceed at once, at its own separate cost, to rebuild or replace said structure, or such substitute therefor as the wants of the joint business may require: *Provided,* such party shall not, at its separate cost, be compelled to erect a more expensive structure in any case than the one injured or destroyed.

ART. XVII. The expense of all permanent improvements shall be borne by the road upon which said improvements shall be made; and when said improvements shall have been authorized and approved by both boards of directors, the interest on the same shall be reckoned as expense, and be a charge upon the joint funds. No expense in the nature of a permanent improvement shall be made by the general manager upon the roads of either of the parties hereto without the consent of the directors of the road so interested.

ART. XVIII. Each road may, at its own expense, at any time, employ competent persons to examine the property in charge of the joint management; and any deficiency or depreciation reported from such examination shall, upon notice to the general manager, be made good, by forthwith putting the property in proper condition, or by an equivalent cash payment from the joint funds: *Provided, however,* if the other party to this contract is dissatisfied with the finding of the said examiner so appointed, the questions in dispute shall be referred to the arbitrators as hereinafter provided.

ART. XIX. All taxes assessed upon the capital stock of the joint roads and roads leased and operated by them, and the property committed to the joint management, shall be considered an ordinary expense, and charged to the operating accounts of the joint roads.

ART. XX. The insurance premiums paid by either party on unexpired policies, for risks upon the property of the joint roads, shall be apportioned in such manner as to become a common charge from and after the commencement of this agreement, each party paying its own premium for the portion of time up to the said date, and charging to the joint account the unexpired portion; and the same apportionment shall be made of any and all payments for rents made by either party for a time extending beyond this date and inuring to the common benefit.

ART. XXI. All expenses of the organization of the roads parties hereto shall be paid from the separate fund of each, and not from the common fund.

ART. XXII. The net income, after payment of all expenses incident to the operation of the joint roads, including rentals as aforesaid, shall be divided between said corporations in the proportion of 60 per cent. to the Boston & Lowell Railroad, and 40 per cent. to the Concord Railroad.

ART. XXIII. All prepayments to either party on transportation account for season and package tickets, or any other prepaid income, shall be apportioned as above, and each party shall be charged for the benefit of the joint account, with their collections, on such unexpired portion of said prepayments.

ART. XXIV. As soon as possible after the close of each month, the income and expense accounts of the joint roads shall be made up, as nearly as may be, and the net balance appearing shall be divided upon the general basis of division hereinbefore stated, and paid over on account to each corporation respectively, subject to a final adjustment at the semi-annual closing of the accounts, which shall occur upon the last days of March and September in each year, inclusive.

ART. XXV. All matters of disagreement under this contract shall be referred to the arbitration of three persons,—Francis B. Hayes on the part of the Concord Railroad, and T. Jefferson Coolidge on the part of the Boston & Lowell Railroad, these two to choose a third,—the decision of a majority of whom shall in all cases be final and conclusive. If a vacancy shall occur on the part of either party, it shall be filled by the board of directors of said party.

ART. XXVI. This agreement shall take effect as of September 1, 1881, and continue in full force for the term of five years from that date.

In witness whereof, the said parties have caused their corporate seals to be hereto affixed, and this instrument to be signed by their respective presidents thereto duly authorized, the day and year first above written.

The Boston & Lowell Railroad Corporation,

[SEAL]                    By J. G. Abbott, *President.*

Concord Railroad Corporation,

[SEAL]                    By J. Thomas Vose, *President.*

Signed, sealed, and delivered in presence of

C. Ed. Bartlett, to J. G. A.

Edward D. Harlow, } to J. T. V.
Emil A. Danielson,

October 8, 1881, the plaintiffs presented to one of the justices the bill in equity which had not been served or filed, and a written application for a temporary injunction to restrain the defendants from operating or meddling with the management of the Concord Railroad under the alleged contract, while the rights of the plaintiffs are being determined on the bill, and to suspend the operation of the contract during litigation. No notice having been given, the plaintiffs were authorized to give notice of a hearing to be had at the office of their counsel in Concord as soon as they pleased. October 10, the plaintiffs gave the Concord Railroad and some of its officers notice of a hearing to be had October 11. On the latter day those defendants who had been notified appeared; and the

Boston & Lowell Railroad appeared without service of notice. The plaintiffs offered to prove that they were stockholders of the Concord Railroad, and that the alleged contract had been made; and moved that their application for an injunction be granted without any inquiry into any other matters of fact,—contending that, as matter of law, the contract having been made, the plaintiffs, being stockholders, were entitled to the injunction asked, because the contract was beyond the corporate power of the Concord Railroad, and would be invalid even if made in good faith and if beneficial to the plaintiffs.    The defendants contended, that without proof of any actual damage done or likely to be done to the plaintiffs' interests, equity would not give the plaintiffs the injunction they asked, before their charges of a fraudulent conspiracy were proved or abandoned, before the legal rights of the parties were settled by a decision of the court on the merits, and before the facts were proved which would be material to be considered on the questions of law.

The justice proposed that, by agreement, the case be entered at the October trial term,—all disputed facts to be found by a referee before the next law term (to be held December 6),—and a case to be reserved, as of the October term, for argument at the December term.    To this proposition the defendants assented.    The plaintiffs objected on the ground that the trial would be protracted beyond the December term at great and unnecessary expense, and that, upon the undisputed facts of the making of the contract and the plaintiffs' ownership of Concord Railroad stock, the case must necessarily be decided in their favor.    The justice being of opinion that the injunction ought not to be issued by one member of the court on the ground taken in the plaintiffs' motion, the plaintiffs desired that a course be taken by which their application and motion might be heard by the whole court in December.    The defendants objected, on the ground that such a course would cause unnecessary delay, as the case could not be properly decided or heard at the law term without proof of other facts than the making of the contract and the plaintiffs' ownership of Concord Railroad stock, and, before December, there could be and ought to be a finding of the facts upon which the questions of law should be submitted to the court at the December term.    At the plaintiffs' request, their application and motion were adjourned to December 6, 1881, for the purpose of giving them an opportunity to present the same to the whole court.

The parties to the alleged contract had entered upon its performance in accordance with its terms, and were performing it when the application for an injunction was made.

*Bingham & Mitchell*, for the plaintiffs.    The questions here presented originate in a motion for an injunction.    The injunction of the defendants from an execution of the contract of August 19,

1881, is sought.    The plaintiffs' right to have this motion granted
is founded upon the position that this contract is invalid or illegal
for the following reasons:

*First*, it is in violation of the charter of the Concord Railroad.

*Second*, it is in violation of the public law of New Hampshire.

*Third*, it is *ultra vires* of the directors of the Concord Railroad.

If either point is sustained, the plaintiffs' motion should be
granted.

Three important and essential facts are found by the case either
to have been proved, or an offer of proof of them made or admitted
by the defendants, viz.,—

(1) The plaintiffs are stockholders of the Concord Railroad.

(2) The contract was made by the defendants.

(3) The execution of the contract has been entered upon by the
defendants.

What more is necessary?    The court have before them the par-
ties, the grievance, and the cause of the grievance.    They have
also before them, at the same time, the charter, the statute law of
New Hampshire, and the common law.    These elements constitute
a complete case.    The reasons for executing the contract; the
motives actuating the parties who were instrumental in causing its
execution; and its effect, whether it be injurious or beneficial to
the interests of the parties affected by it,—are immaterial, and for-
eign to the real question involved in this motion, viz., Were the
directors of the Concord Railroad, on August 19, 1881, vested with
power to bind the Concord Railroad in the execution of this con-
tract?

The plaintiffs' right to be heard upon the question of the valid-
ity or invalidity of this " business contract only," arises from their
relation to the corporation whose rights, property, and franchises
are being interfered with under it.    They and their associates,
constituting the corporation, are the owners and masters: the direc-
tors are simply their agents and servants.    As is said in *Koehler* v.
*Black River Falls Co.*, 2 Black 715, " The directors are the trus-
tees or managing partners, and the stockholders are the *cestuis que
trust  *  *  *  * of the corporation.*"    As was said by Judge *Woods*
in *Gillis* v. *Bailey*, 21 N. H. 162, " The directors of a corporation
are merely its agents, and are not the corporation."    In *Tippets* v.
*Walker*, 4 Mass. 596, *Parsons*, C. J., said, " The directors are not
a corporation, but the agents of one."    See, also, to the same point,
Angell & Ames Corp. 256, *et seq.*; Pierce on Railroads, 36 *et seq.*
These agents, trustees, or servants have powers and prerogatives
that are prescribed and limited, and within which the law compels
them to act.    When they perform an act beyond the line pre-
scribed, it is not the act of their principal, the corporation, because
their agency did not embrace it.    And when they do this, they
violate their trust.    " Stockholders have a remedy in equity to pre-
vent violations of the charter, or acts *ultra vires* amounting to a

breach of trust, or endangering the existence of the corporation."
Pierce on Railroads 43. "Equity will enjoin a corporation and its
officers, at the suit of a stockholder, from entering into contracts
or engaging in transactions which are in violation of the charter,
and involve a breach of trust on the part of the corporation and its
officers." Pierce on Railroads 520. See, also, *Fisher* v. *Concord
Railroad*, 50 N. H. 210; *March* v. *E. R. R. Co.*, 40 N. H. 548—*S. C.*,
43 N. H. 515, 531, 532. "It is the undoubted right of stockholders
of a corporation to apply to the courts by action against the cor-
poration itself, upon the diversion or threatened diversion of the
corporate funds to purposes unauthorized by their charter, and for
breach of duty.   *   *   *   As against such stockholders all unau-
thorized contracts are *ultra vires*, for which they can claim affirm-
ative interposition of the courts to prevent threatened diversion."
Potter Law of Corp., s. 555; *Dodge* v. *Woolsey*, 18 How. 331.

A corporation is a creature made by a legislative act. The act
creates its powers, privileges, and franchises, and restricts and
limits them. It is no larger than the chartered design: its rights,
powers, and privileges are no more extensive than those specified
in "its source of life,"—the charter. It has such powers and such
only as are expressly granted to it, or such as are necessarily inci-
dental to those granted. Its incidental powers are such and only
such as are directly and immediately essential to the exercise and
execution of those powers which are specifically granted, and not
such as have a slight or remote relation to those granted. And
the rights, powers, and franchises, conferred upon the corporation
by its charter, are for itself to use and exercise. It cannot dele-
gate them to others without the expressed consent and authority
of the legislature,—the power creating it. It cannot absolve itself
from its duty to use and exercise the privileges granted, by asking
or permitting others to do it, even though others may do it as well.
It is the corporation, and the corporation alone, upon whom these
special and extraordinary privileges are conferred. In considera-
tion of receiving those special and extraordinary advantages, they
must not only always use the powers granted, but must always
hold themselves in a condition to use and exercise them. Their
charter is a contract with the state. It is not assignable or trans-
ferable. There are but two parties recognized in it,—the state
and the corporation. That these views and positions are sustained
by the law is demonstrated, we submit, by the following author-
ities: "A corporation is an artificial being, invisible, intangible,
and existing only in contemplation of law. Being the mere creat-
ure of law, it possesses only those properties which the charter of
its creation confers upon it, either expressly or as incidental to its
very existence." Opinion of C. J. Marshall in *Dart. Coll.* v. *Wood-
ward*, 4 Wheat. 636. "A corporation is a creature of the law.
Deriving its existence and faculties from the express grant of the
legislature, it has only the powers so conferred, and all others are

presumed to have been withheld. That legislative grants to a corporation, whether of powers or exemptions, are to be strictly construed, so that nothing passes except what is given in clear and explicit terms, is a familiar doctrine, which is applied with more stringency when the powers in question interfere with private rights, or abridge important functions of government." Pierce on Railroads 491.

"It is now established beyond question, that not only are the capacities of corporations limited in degree, but so, also, are the purposes and ends for which they propose to employ those capacities. Corporations are created for the accomplishment of certain ends, * * and in this behalf they are endowed with various powers and privileges other than such as are possessed by private persons; but these powers and privileges are given to corporations in a qualified manner only, and not absolutely." Green's Brice's *Ultra Vires* 471. "Corporations are creatures of the legislature, having no other powers than such as are given to them by their charters, or such as are incidental or necessary to carry into effect the purposes for which they were established." *Downing* v *Mt. Washington Road Co.*, 40 N. H. 232; *Trustees* v. *Peaslee*, 15 N. H. 330; *Perrine* v. *Chesapeake Canal Co.*, 9 How. 172. "A corporation has only such powers as are specifically granted, or such as are necessary for carrying the former into effect; and these powers can only be exercised for the purposes contemplated by the charter." Brightly's Fed. Dig., tit. Corp.; *Beaty* v. *Knowler*, 4 Pet. 152; *Farnum* v. *Blackstone Co.*, 1 Sumn. 46. "A corporation can do no acts, within or without the state which created it, except such as are authorized by its charter." Brightly's Fed. Dig., tit. Corp.; *Bank* v. *Earle*, 13 Pet. 519; *R. R. Co.* v. *Kneeland*, 4 How. 16; *Runyan* v. *Lessee*, 14 Pet. 122. "It is familiar law, that a corporation possesses such powers, and such only, as the law of its creation confers upon it." *Franklin Co.* v. *Lewiston Sav. Inst.*, 68 Me. 43. In this case, the defendants undertook to buy stock, and pledged the bank's credit, but it was held to be beyond their power. See, also, *Bank* v. *Agency Co.*, 24 Conn. 159; *Berry* v. *Yates*, 24 Barb. 199. "Corporations can make no contracts which are not necessary, either directly or indirectly, to effect the objects of their creation." *Abbott* v. *Steam Packet Co.*, 1 Md. Ch. 542; *Kitchen* v. *Cape Girardeau R. R.*, 59 Mo. 514. A corporation chartered to boom lumber cannot drive lumber. *Boom Corp.* v. *Whiting*, 29 Me. 123. "The modern doctrine is to consider corporations as having such powers as are specifically granted by the act of incorporation, or are necessary for the purpose of carrying into effect the powers granted, and as not having any other." 2 Potter Corp. 652. What are recognized as the incidental powers of corporations may be gathered from the following: "Such powers only are implied as are necessary and incidental to the express powers and are within the scope and purposes of the charter." Pierce on Rail-

roads 515. "An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has a slight or remote relation to it." *Hood* v. *N. Y. & N. H. R. R.*, 22 Conn. 16; *Curtis* v. *Leavitt*, 15 N. Y. 127; *Buffett* v. *T. & B. R. R.*, 40 N. Y. 176; *Beaty* v. *Knowler*, *supra*.

What powers were granted the Concord Railroad by the legislature? To answer this, we must go to the charter. "In determining the extent of the power of a corporation, whether municipal or private, to make contracts, and what contracts are within that power and what are *ultra vires* and void, it becomes necessary to examine the mode in which the power is to be exercised. This demands a careful study of the charter of the incorporating act, and the general legislation of the state on the subject, if there be any." 2 Potter Law of Corp. 652.

(1) It is not pretended that this contract has the sanction of any express legislative act, under *s*. 2 of *c*. 159 of Gen. Laws: "No sale, lease, mortgage, or contract for the use of any railroad shall be valid unless it shall be in writing, filed in the office of the secretary of state, and authorized by the legislature." It is not a contract by virtue of this law. Neither is it claimed that the parties to this "business contract only" so far observed the law of the state as to procure either the sanction of the railroad commissioners, or its approval by the governor and council.

"No contract between two or more railroad corporations, for the use of their roads, shall be legal or binding for a longer time than five years, nor unless sanctioned in writing by the railroad commissioners and approved by the governor and council." Gen. Laws, *c*. 164, *s*. 101.

The signers of this contract, it is true, call it "a business contract only;" but the statute permits "no * * contract for the use of any railroad" to be made in this way. G. L., *c*. 159, *s*. 2. "No contract between two or more railroad corporations, for the use of their roads, shall be legal," etc. This includes "business" contracts, when it is a contract for the use of a road or roads. "The joint management herein provided for shall have * * the entire control of the roads of each party, their shops, depots, furniture, rolling stock, machinery, tools, and other property necessary for the maintenance and working of the joint roads, also all lands and buildings, for whatever purposes used, within or without the location of the roads of each party, and others owned, leased, or operated by them, reserving only to the separate management such other property of each corporation as has been accumulated." Art. 2 of Contract. This is a contract "for the use of their roads;" and having been neither authorized by the legislature, sanctioned by the railroad commissioners, nor approved by the governor and council, it is illegal.

The charter bears date June 27, 1835. The corporation is by it

"vested with all the powers, privileges, and immunities, which are or may be necessary to carry into effect the purposes and objects of this act as hereinafter set forth, and subject to all the liabilities of corporations of a similar nature." "And the said corporation are hereby authorized and empowered to locate, construct, and finally complete a railroad" between designated points.   Section 2 fixes the capital stock, and then provides that " the immediate government and direction of the affairs of the said corporation shall be vested in seven directors."   Article 9 of the contract provides,—" The joint roads shall be operated and managed," not by the seven directors designated by the charter, but by " a general manager," " chosen by the concurrent vote of a majority of the directors of each party."   The Boston & Lowell Railroad directors elect, or help elect, a manager for the Concord Railroad.   A manager cannot be elected without their consent.   "And the respective boards of directors shall, by such concurrent action, exercise the same control over the management as is usual with boards of railroad directors in ordinary cases."   Art. 9.   By the charter the Concord Railroad has seven directors charged with the management and direction of its affairs, while by this contract its management and the direction of its affairs are confided to the care and custody of twelve directors.   This is a clear violation of the charter.

Can the directors of the Concord Railroad transfer an undivided half of the entire management and " control " of its road, " shops, depots, furniture, rolling stock, machinery, tools, and other property," to the directors of the Boston & Lowell Railroad, without the consent of the corporation, the legislature, or governor and council ?   If they can transfer half, they certainly can the whole. This is what they have done, or attempted to do.   It is a complete surrender to the Boston & Lowell directors of one half the control and management of the Concord Railroad.   Five men, unknown to the charter, unknown to its stockholders, and unknown to the law of New Hampshire, are now in charge of the Concord Railroad's affairs.   It can do nothing unless concurred in by these men.   Can the directors of the Concord Railroad, or even the corporation itself, thus transfer their duties under the charter, and divide their responsibilities with others, and absolve themselves from the government and direction of the affairs of the corporation, or any part of them ?   We maintain they cannot.   In *Pierce* v. *Emery*, 32 N. H. 504, C. J. *Perley*, in speaking of the duty of railroad corporations, said,—" They are created to answer a public object, and are bound to the state for the performance of their public duty.   They can do no act which would amount to a renunciation of their duty to the public, or which would directly or necessarily disable them from performing it."   In 2 Potter's Law Corp. 496, it is laid down,—" While the law affords railroad corporations adequate and complete protection in the exercise of their

chartered rights, it also holds them to a strict performance of the duties enjoined upon them, as a consideration for the rights and powers thus granted." In Pierce on Railroads 514, it is said,— " Corporations having, by reason of their objects, or the extraordinary powers conferred upon them, certain public obligations, are not permitted to enter into contracts which disable them from performing their public functions. Thus, a railroad corporation cannot, as already seen, without legislative authority, transfer by deed, mortgage, lease, or other agreement, its railroad franchises, or assume the ownership or management of some other like enterprise. Such a transfer may have the effect to substitute a scheme differing from that for which authority was obtained, to put the management into the hands of persons other than those intended, and to combine enterprises which the legislature presumably thought it prudent to keep separate." In delivering the opinion of the court, in *Thomas* v. *Railroad*, 101 U. S. 83, Judge *Miller* said, in speaking of a contract like this,—" There is another principle, of equal importance and equally conclusive against the validity of this contract, which, if not coming exactly within the doctrine of *ultra vires*, as we have just discussed it, shows very clearly that the railroad was without power to make such a contract. That principle is, that where a corporation like a railroad company has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those franchises being the consideration of the public grant, any contract which disables the corporation from performing those franchises, which undertakes without the consent of the state to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is in violation of the contract with the state, and is void as against public policy."

The transfer, delegation of authority, and alienation of the entire control of the Concord Railroad and its " shops, depots, furniture, rolling stock, machinery, tools, and other property necessary for the maintenance and working of the " road, which the contract contemplates, has been accomplished. The contract was on October 11, and is now being performed. " The immediate government and direction of the affairs of the " Concord Railroad is not now, and was not when our motion for an injunction was made, on October 11, " vested in seven directors," but is now and was then vested in a " general manager," whose election was dictated by the directors of a foreign corporation, or whose election had to be secured through their concurrence, which practically is the same. The general supervision of this general manager's management of the Concord Railroad and its affairs is not even left to seven directors, but it is by the contract vested in twelve. Under this contract, the employment of agents and servants to operate the Concord Railroad is vested as completely in the Boston & Lowell Cor-

poration as it is in the Concord Railroad Corporation. They have the same power to employ and dismiss. The right to the use of every car and engine of the Concord road is as much the privilege of the Boston & Lowell as it is of the Concord. Such a surrender never was or could have been contemplated by the legislature under this charter. If the Concord Railroad can thus surrender and alienate one half of its "entire control," it certainly can the whole. The power authorizing or justifying a transfer of a fractional part will warrant the transfer of the whole.

By s. 2 of the charter "the directors shall elect   *   *   a treasurer, who shall give bonds to the corporation   *   *   for the faithful discharge of his trust." The by-laws of the corporation, which under the charter it had power to make, prescribe the treasurer's duties in Art. 7. "It shall be the duty of the treasurer   *   *   safely to keep   *   *   all the moneys, securities, and valuable papers,— to disburse and deliver over the same as the directors shall require, keep his books and accounts in an approved form, showing the true condition of the finances and funds of the corporation." The treasurer is to keep and disburse all moneys. This means, to keep all earnings of the road, and pay cost of running it. Under this contract the earnings of the road do not go to the treasurer elected by the Concord Railroad, as directed by the charter and by-laws, but they go directly into the "care and custody" of "a cashier, who shall be chosen by the concurrent vote of a majority of the directors" of the Concord road and the directors of the Boston & Lowell road. Art. 10 of Contract. Can the moneys of the Concord Railroad be sent into the hands of such a person, and such a person only, as it is the pleasure of a foreign corporation to designate, and whose election it may dictate? If the Boston & Lowell Corporation can be thus permitted to manage the Concord Railroad and dictate the depository of its earnings, by the same principle the Grand Trunk, New York Central, Pennsylvania Central, either of the Pacific railroads, or a railroad in England, may do it. Such a dictation or management is entirely foreign to anything contemplated or authorized by the charter or laws of New Hampshire. And to tolerate and permit such a course is to admit that the barriers, formerly holding directors and corporations within their chartered sphere and to a strict performance of their corporate duties, have disappeared. With the earnings of the Concord Railroad all in the hands of a "cashier," and mingled with those of the Boston & Lowell Railroad, how is the treasurer, the officer designated by the charter, to show "the true condition of the finances and funds of the corporation," as required by the by-laws? He cannot; and any contract having the effect to disable him from performing his duty is in violation of the charter, and is *ultra vires* of the corporation and its directors. In speaking of the treasurer's duty and the invalidity of a contract which entrusted another with his duties, Judge *Smith*, in *Pearson* v. *Tower*, 55 N. H.

216, said,—" The duties of the treasurer should not be merely nominal. He is required to give bond for the faithful performance of the duties of his office, and he is the proper custodian of the funds of the corporation. * * There is nothing in the language of this by-law that authorizes the directors to make such a disposition of the funds of the corporation as would practically make the duties of the treasurer merely nominal, and relieve him from liability for the safe-keeping of the funds. * * " The natural and reasonable construction of the language of the statutes, charter, and by-laws of the corporation, requires that the treasurer, in disbursing the funds of the corporation according to the requirement of the directors, should pay them out to satisfy such claims against the corporation as the directors shall authorize; and until the funds be needed for that purpose the treasurer is the only proper officer of the corporation to whom the custody of the funds of the corporation should be entrusted." Here is a clear, distinct judicial announcement that no " cashier " can be substituted for the treasurer. The treasurer must do his own work. He is the custodian, and the only custodian, of the corporation's funds, who is recognized by the law. In this case a perpetual injunction was granted, and is still in force, enjoining the Concord Railroad from diverting its funds in the manner now attempted and now accomplished. The injunction, even, is disregarded.

But this is not all the diversion of the funds of the Concord Railroad which is contemplated and accomplished by this contract. *First*, its earnings must go toward paying the following rentals of roads leased to or controlled by the Boston & Lowell Railroad, viz.,—For the Massachusetts Central Railroad, 25 per cent. of its gross earnings; for Middlesex Central Railroad, $15,000 per year, and 6 per cent. on cost of present extension; for Nashua & Lowell, $65,000 per year; for Wilton Railroad, $14,130 per year; for Peterborough Railroad, 6 per cent. on cost of road, taxes, and $150 per year for organization expenses; for Stony Brook Railroad, 6 per cent. on capital stock, taxes, and $300 per year for organization expenses. Art. 4 of Contract. Where is the authority for taking the earnings of the Concord Railroad for this purpose? Justification for such an assumption of uncertain and extensive obligations on the part of the directors of the Concord Railroad is not to be found in the law of the creation or government of corporations. It is a diversion of the funds of the corporation from the purposes designed and contemplated by the charter, and the contract which attempts it is *ultra vires* and void. *Second*, the earnings of the Concord road are to be appropriated to a payment of part of the interest on the cost of the equipment of the Massachusetts Central Railroad, and to contribute toward making good the depreciation of such equipment. Art. 13 of Contract. *Third*, the earnings of the Concord Railroad under this contract must contribute toward the cost of the insurance of the " bridges, depots, buildings, wharves,

fixtures, and other property" of the Boston & Lowell Railroad, and all such as belong to the roads under its control.   Art. 16 of Contract.   *Fourth*, its earnings must contribute toward the payment of interest upon the cost of permanent improvements on the Boston & Lowell road and its leased lines.   Art. 17 of Contract.   *Fifth*, its earnings must contribute toward the payment of "all taxes assessed upon the capital stock" of the Boston & Lowell road and its branches.   Art. 19 of Contract.   *Sixth*, its earnings must contribute toward the "payment of all expenses incident to the operation of" the Boston & Lowell and all its leased lines.   Art. 21 of Contract.   These provisions, we submit, indicate as clear a diversion of the funds of the Concord Railroad as it is possible to state. It may be suggested that the Boston & Lowell Railroad does the same under the contract.   That is not an answer.   Two wrongs have not yet come to be recognized as an equivalent to one right.

Nor does the fact that their design may have been honest, their motives pure and unselfish, and the results of their "business contract" beneficial, advantageous, and worthy, save them.   These are not elements which either excuse or palliate a violation of the charter or the law, or justify an exercise of authority in excess of that conferred by the charter.   As said by Judge *Selden*, in *Bissell* v. *Railroad*, 22 N. Y. 258, 285,—"The contracts of corporations which are not authorized by their charter are illegal, because they are made in contravention of public policy.   *   *   *   Although the unauthorized contract may be neither *malum in se* nor *malum prohibitum*, but, on the contrary, may be for some benevolent and worthy object,—as to build an almshouse or a college, or to purchase and distribute tracts or books of instruction,—yet, if it is in violation of public policy for corporations to exercise powers which have never been granted to them, such contracts, notwithstanding their praiseworthy nature, are illegal and void.   *   *   *   The importance of limiting corporate bodies to the exercise of those powers and the enjoyment of those privileges and franchises which have been specifically conferred upon them, must, I think, be obvious.   They are rapidly multiplying.   Their privileges give them decided advantages over mere private, unincorporated partnerships. They have large capitals and numerous agents, and are capable of entering into combinations with each other.   They are not only formidable to individuals, but might even, under some circumstances, become formidable to the state.   They are, or should be, created, as we have seen, for public reasons alone; and the legislature is presumed, in every instance, to have carefully considered the public interest, and to have granted just so much power, and so many peculiar privileges, as those interests are supposed to require."   The legislature of New Hampshire deemed this wholesome principle of the common law of sufficient interest and importance to the people of the state to make it the subject of express enactment.   "Any such corporation may make contracts necessary

and proper for the transaction of their authorized business, and no other." G. L., c. 147, s. 5;—see, also, s. 6.

Section 5 of the charter provides "That a toll be and hereby is granted and established for the sole benefit of said corporation, upon all passengers and property of every description which may be conveyed or transported upon said road, at such rates per mile as may be agreed upon and established from time to time by the directors of said corporation." This is toll for the sole benefit of the corporation, not for the benefit of the corporation and others. The rate is to be agreed upon and established by the directors of the Concord Railroad, and not by the "concurrent action" of the directors of the Concord Railroad and those of another, different, and foreign corporation. How does the contract regulate this? It provides,—"No changes in the present local or through rates for transportation shall be made without the approval of the local road so interested, and the joint management." Can the directors of the Concord Railroad now agree upon and establish rates "from time to time"? That duty, devolving upon them alone under the charter, is, under the contract, to be performed by them in company with "the joint management," without whose consent "no change" can be made. Art. 11 of Contract. This is a delegation of their chartered duty, an attempt to divide the responsibility of discharging an obligation imposed by the charter, a partial renunciation of their public trust, and renders them unable to perform their obligations to the state, which were the considerations for the special and extraordinary privileges granted by the charter.

By section 17 of the charter, the legislature reserved the right, after the expiration of twenty years after the completion of the road, to "purchase the same of said corporation, and the franchises, rights, and privileges of said corporation, by paying them therefor the amount expended in making said road." Can the corporation now sell the road, franchises, rights, and privileges conferred by the charter? Has it not transferred part of its rights and privileges for five years? The contract makes no provision for its termination upon condition that a right to purchase is demanded by the state. This contract creates in this particular another disability of the Concord Railroad to perform its chartered duty.

What is this contract? i. e., What is its effect between the parties? What is the legal name for the arrangement to which these parties attempted to bind themselves? Of course we do not forget, in our search for its name, that its draughtsman named it "a business contract only;" and then he declares what it shall not be called, viz., "in no sense as a lease of one road to the other, or as a union of their corporate powers or privileges." This, in short, is simply a proclamation of innocence, honesty, and good faith, and that no laws or chartered provisions have been violated. This

does not aid us. It simply confuses, and envelops the matter in greater mystery, and throws suspicion upon its integrity. In *Twyne's Case*, 3 Co. 80 b., it will be remembered that the honest and apparently innocent declaration " that the gift was made honestly, truly, and *bona fide*" did not save it, but, on the contrary, subjected it to suspicion. When this contract and all its parts are subjected to analysis, the result logically and inevitably reached is, that the arrangement into which these parties have entered is a copartnership. There is not an element wanting. It is full and complete in all its parts. It has the parties, the capital, the business, the profits, and the losses. If "joint management" was a visible, tangible, recognizable being, independent of the joint boards of directors, then it would be a lease. But all its parts, when combined, make a much more perfect copartnership. "Joint management" means both corporations acting together jointly. This makes the copartnership. Under article 2 of the Contract, both corporations, under the style of "joint management," have "the entire control of the roads of each party, their shops, depots, furniture, rolling stock, machinery, tools, and other property necessary for the maintenance and working of the joint roads." This puts the capital of both together, and makes it one capital under one management, each party enjoying and exercising the same rights in the control and management of the property of the other as in its own. This constitutes the joint capital. All the roads of both parties are managed by one and the same "general manager," who is elected by them jointly. He is the agent and servant of the one party as much as of the other. Art. 9 of Contract. All the earnings of all the roads of both parties go into one pocket indiscriminately. Here exists the unit management,—the capacity of the same person to bind one party by his act as firmly and irrevocably as he can bind the other, and thereby is created the authority of one to bind the other reciprocally, which is one of the strongest marks of a copartnership. All expenses incurred in running all the roads are deducted from the joint earnings, or the earnings of each, which are commingled in one pocket. Art. 22 of Contract. The expense of running the Boston & Lowell road, or part of it, comes out of the earnings of the Concord road, and *vice versa.* Liabilities incurred and damages sustained in running over the Boston & Lowell road, or any of its leased lines, must be shared by the Concord road, and *vice versa.* Art. 8 of Contract. In these elements we find the community of loss complete. "The net income * * * shall be divided between said corporations in the proportion of 60 per cent. to the Boston & Lowell Railroad, and 40 per cent. to the Concord Railroad." Art. 22 of Contract. This is the provision for the community of profits. These elements are all that is required to make a complete partnership.

In Story on Partnership, *s.* 2, partnership is defined as "A contract between two or more persons, by which they join in common

either their whole substance, or a part of it, or unite in carrying on some commerce, or some work, or some other business, that they may share among them all the profit or loss which they may have by the joint stock which they have put into partnership." As defined by Chancellor Kent,—"Partnership is a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions." 3 Kent Com. 23. Where a contract provided that the party of the first part should, in his own name, but in the joint account of himself and the parties of the second part, secure a lease of a railroad, and manage the same at a designated salary for their mutual benefit, the parties of the second part to furnish the necessary money to carry on the enterprise, but to be reimbursed with interest out of the annual profits, and after the payment of such sum, the losses to be borne and the profits to be divided equally between them, it was held to constitute a partnership. *Beauregard* v. *Case,* 91 U. S. 134;—see, also, *Wills* v. *Simmonds,* 51 How. (N. Y.) Pr. 48; *Hills* v. *Bailey,* 27 Vt. 548; *Somerby* v. *Buntin,* 118 Mass. 279; *Ward* v. *Thompson,* 22 How. 330; *Mumford* v. *Nicoll,* 20 Johns. 611; *Gilbank* v. *Stephenson,* 31 Wis. 592.

Are corporations, in the absence of express legislative authority, authorized to engage in copartnership? Is a contract creating a copartnership either in violation of the charter or the statute law of New Hampshire, or is it *ultra vires* of the corporation or its directors? We maintain the negative of the first, and the affirmative of the second, of these propositions. There is no express warrant for it in the charter. There is no public statute of New Hampshire which in any way warrants or justifies a combination of that character. The public policy of New Hampshire legislation is, and always has been, antagonistic to any and all contracts in any way creating combination, consolidation, or monopoly, without express legislative consent. It has uniformly aimed to compel each corporation to do its own business, perform its own public duties, and keep itself within its corporate province, and not farm them out to others, even though the others may possess the qualities of efficiency, respectability, and responsibility in the superlative degree. The grant was made, and the trust committed to the chartered corporation, and to that only. It is neither allowed to invite others to share with it the powers, privileges, and franchises conferred, nor to grant the request of others to do so. That it was the design of the legislature of New Hampshire, so far as the formation of the public policy on this subject was within its province, to establish one of the character above suggested, is evident from the following statutes: G. L., *c.* 147, *ss.* 5, 6; *c.* 148, *s.* 3; *c.* 157, *s.* 7; *c.* 158, *ss.* 11, 12; *c.* 159, *ss.* 2, 3, 10; *c.* 160, *ss.* 1, 2; *c.* 164, *s.* 10. These statutes are designed to restrain corporations within their legitimate limits.

The principles of the common law are quite as direct and emphatic on this subject. This is manifest from the authorities before cited. Contracts of copartnership have been uniformly held by the courts to be *ultra vires.* "Agreements between companies, which create a partnership between the parties thereto, are void." Green's Brice's *Ultra Vires* 423. Corporations at common law have certain powers, but not such as would authorize the forming of a partnership, or the consolidation of two companies into one." *New York & Sharon Canal Co.* v. *Bank,* 7 Wend. 412. In *Whittenton Mills* v. *Upton,* 10 Gray 596, the court, in speaking of a section of the Massachusetts statute identical with the provisions of the following section of our statute, " The business of every such corporation shall be managed by the directors thereof, subject to the by-laws and votes of the corporation, and, under their direction, by such officers and agents as shall be duly appointed by the directors or by the corporation," *c.* 148, *s.* 3, said,—" It is plain that the provisions of this section cannot be carried into effect where a partnership exists. The partner may manage and conduct the business of the corporation, and bind it by its acts.   *   *   *   And the formation of a contract, or the entering into a relation by which the corporation or the officers of its appointment should be divested of that power, or by which its franchises should be vested in a partner with equal power to direct and control its business, is entirely inconsistent with that policy. " The power to form a partnership is not only not among the powers granted expressly or by reasonable implication, but is wholly inconsistent with the scope and tenor of the powers expressly conferred, and the duties expressly imposed, upon a manufacturing corporation under the legislation of the commonwealth." See, also, *Pearce* v. *Railroad,* 21 How. 441 ; *Marine Bank* v. *Ogden,* 29 Ill. 248 ; Ang. & A. Corp. 248 ; and authorities previously cited.

It is entirely immaterial what this contract is named, whether a copartnership, lease, agreement, or " business contract only." The question always returns. and with as much emphasis in the one case as in the other, Is it in accordance with the charter ? is it in accordance with the statute law of New Hampshire ? or, is it a contract, the execution and performance of which are *ultra vires* of the directors of the Concord Railroad ? " Corporations may not give up to others their special powers, or the control of their undertakings." Green's Brice's *Ultra Vires* 427, *et seq.* In *Railway* v. *Railway,* 9 Hare 306, it is said,—"An agreement between two railway companies, made without the authority of the legislature, whereby one company delegates to another all the powers which have been conferred upon it by parliament, is an unlawful attempt to effect that which parliament alone can authorize, and is against public policy ; and in such a case the court will not interfere to assist either of the parties in obtaining a collateral benefit, which the agreement would give, or aid them in any manner which would

promote the object of the agreement." This was an action between the two companies to the agreement. In *Winch* v. *Railway*, 13 Eng. L. & E. 507, was involved the validity of a contract, the material part of which is as follows : " The Birkenhead, Lancashire & Cheshire Junction Railway Company are to give the Associated Companies all the rights, conveniences, and accommodations of their line, stations, offices, sidings, sheds, warehouses, watering-places, &c., and are to incur every charge or expense incidental to the use of them, * * excepting only the use of locomotive power, carriages, &c., which are to be provided and employed by the associated companies." In speaking of this transfer, Sir *J. Parker*, V. C., said,—" Now I think it is impossible that that can be carried out without delegation or transfer to the London & North Western Railway Company of some, at least, of the duties and powers which are given exclusively to the Birkenhead Company by their acts of parliament. * * It seems to me that it is not a question of simple incapacity on the part of the London & North Western Railway Company to undertake the working of this line, but it is against the policy of these acts of parliament; and I think, therefore, that the agreement for making over this property to them is an agreement savoring of illegality, which any shareholder in the Birkenhead Company has a right to come to the court to restrain." This was decided in the law court, and reported in 5 De G. & Sm. 562. *Beman* v. *Rufford*, 6 Eng. L. & E. 106, was a case involving a similar inquiry. In delivering the opinion, Lord *Cranworth*, V. C., said,—" I will not allow any speculation that it would be more advantageous to do something which the act of parliament does not authorize to be done. * * And * * the contract * * is of itself an illegal contract, and therefore ought not to be carried into effect. And if that be the correct view of the law, I am clearly of opinion, on all the authorities and all principle, that it is the province of this court to prevent such an illegal contract from being carried into effect, because, on the principle so often laid down, this court will not tolerate that parties having the enormous powers which those railway companies have obtained, shall lay out one farthing of the funds out of the way in which it was provided by the legislature, that they should be applied." This case is also found in 1 Sim. N. S. 550 ;—see, also, 10 Beavan 1; 12 Beavan 339. A similar question being under consideration in *Gt. Northern R'y* v. *Eastern Counties R'y*, 9 Hare 312, the court said,—" The plaintiffs are to manage and regulate the railways of the East Anglican Company for the purposes of the agreement; and, although in form it is declared that the instrument shall not operate as a lease, or agreement for a lease, it amounts, in substance, to either the one or the other. It is framed in total disregard of the obligations and duties which attach upon these companies ; and it is an attempt to carry into effect, without the intervention of parliament, what cannot

lawfully be done except by parliament in the exercise of its discretion with reference to the interests of the public."

In *Colman* v. *Railway*, 10 Beavan 15, Lord *Langdale* said,— " It has been very properly admitted, that railway companies have no right to enter into new trades or business not pointed out by the acts; but it has been contended that they have a right to pledge, without limit, the funds of the company in the encouragement of other transactions, however various and extensive, provided the object of that liability is to increase the traffic upon the railway, and thereby to increase the profit to the shareholders. There is, however, no authority for anything of that kind." See, as sustaining the same doctrine, *East Anglian Railway* v. *Eastern Counties Railway*, 11 C. B. 775. In 8 Ch. App. Cases 679 was a case of the following character : An insurance company was established, with 10£ shares, with the shareholders' liability limited to the amount payable on shares. By its deed of settlement, it was authorized to purchase the business of any other company of a similar nature. Under this authority, the company resolved to purchase the business of a company established with shares of 50£ each. This was held *ultra vires*, the court saying,— " It would require very clear powers to enable a man's partner or partners, or, in a joint stock company, his delegated officers, or the majority of his co-shareholders, to make him a partner with any other person, or a shareholder in any other society.  *  * But in truth, the more or less similarity of the objects, or even absolute identity of the objects, does not affect the principle. It is the entering into a new contract of partnership with new persons, under a new constitution, which is absolutely *ultra vires* and void unless specially provided for and authorized." *Railway* v. *Railway*, 11 C. B. 775 ; *MacGregor* v. *Manager of Railway*, 16 Eng. L. & E. 182.

*Thomas* v. *Railroad*, 101 U. S. 71, is a recent decision of the supreme court of the United States upon a contract, the essential features of which were like the one at bar. The plaintiffs, on October 8, 1863, entered into an agreement with the Millville & Glassboro' Railroad, a New Jersey corporation, whereby it was stipulated that the company should and did lease to them its road, buildings, and rolling stock for twenty years. There was no special legislative authority for it. In March, 1878, the legislature authorized the consolidation of this company with the West Jersey Railroad Co. The plaintiffs thereupon brought an action for damages they sustained in consequence of the failure of the Millville & Glassboro' Railroad to carry out their contract with them. The circuit court held the contract *ultra vires*, and that the plaintiffs could not recover upon it. The supreme court affirmed this holding. In delivering the opinion of the court, Judge *Miller* said,— " But while we are satisfied that the contract is both technically and in its essential character a lease, we do not see that the deci-

sion of that point either way affects the question on which we are to pass. That question is, whether the railroad exceeded its powers in making the contract, by whatever name it may be called. * * * We take the general doctrine to be, in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such, and such only, as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter is the measure of its powers, and that the enumeration of its powers implies the exclusion of all others. * * * We have given this case our best consideration, on account of the importance of the principles involved in its decision; and, after a full examination of the authorities, we can see no error in the action of the circuit court." The court here also decided that a corporation cannot absolve itself from a discharge of its duties by transferring its powers. Its language on this point we have herein before quoted. See also cases cited by Judge *Miller.* In *Black* v. *Delaware & Raritan Canal Co*, 22 N. J. (Eq.) 399, where a like question was raised, discussed, and decided, it was said,—"It may be considered as settled that a corporation cannot lease or alien any franchise or any property necessary to perform its obligations and duties to the state without legislative authority. * * * This rule is founded in reason and principle. The franchises granted by the state are often parts of the sovereign power delegated to a subject, and always privileges to which other citizens are not entitled. In these grants the state is supposed to regard the character of the grantee, or the guards and restrictions placed upon the corporation when the grant is by a charter to persons continually changing by transfer of stock. In this case the franchise of maintaining a canal and railroads across public highways and navigable rivers, and of taking tolls and rates of fare fixed by themselves, without control, are with others a material part of the property leased. These cannot be leased or aliened without consent of the state." *Railroad* v. *Winans*, 17 How. 39. In this case the plaintiff was a Pennsylvania corporation, but its stock was owned by the Baltimore & Susquehanna Railroad; and "the management of the road is committed to the Maryland company. * * * To preserve appearances with the legislature, an annual statement is made. In this the gross receipts of the entire road for the year are ascertained, and the expenses are deducted. The balance is the dividend, one third being assigned to the plaintiff." The plaintiff claimed that this "agreement to divide the profits did not constitute a partnership, nor evince a relation of principal or agent to impose a liability." To this position, Judge *Campbell*, in delivering the opinion of the court, said,—"This conclusion implies that the duties imposed upon the plaintiff by the charter are fulfilled by the construction of the road, and that by alienating

its right to use, and its powers of control and supervision, it may avoid further responsibility.   But those acts involve an overturn of the relations which the charter has arranged between the corporation and the community.   Important franchises were conferred upon the corporation to enable it to provide the facilities to communication and intercourse required for the public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided, as a remuneration to the community for their grant.   The corporation cannot absolve itself from the performance of its obligation without the consent of the legislature.   *   *   *   It is certainly true that the law will strip a corporation or individual of every disguise, and enforce a responsibility according to the very right, in despite of their artifices.   And it is equally certain that, in favor of the right, it will hold them to maintain the truth of the representations to which the public has trusted, and estop them from using their simulation as a covering or defence."

In *Pearce* v. *Madison & Indianapolis Railroad*, 21 How. 441, two railroad corporations, chartered by the state of Indiana, were consolidated by agreement, and assumed the name of Madison, Indianapolis & Peru R. R. Co., and under that name, and under a common management, conducted the business of both roads.   The head-note is,—" Where two separate corporations were created to make railroads, they had no right to unite, and conduct their business under one management; nor had they a right to establish a steamboat line to run in connection with their railroads."   Judge *Campbell*, in the court's opinion, says,—" There was no authority of law to consolidate these corporations, and to place both under the same management; or to subject the capital of the one to answer for the liabilities of the other."   In Green's Brice's *Ultra Vires*, 415, 416, it is laid down,—" Contracts between companies which create in fact, if not in name, partnerships, are void, on the double ground of being *ultra vires*, and also contrary to public policy; and any arrangement for the division of tolls must, it is presumed, be objectionable upon the same grounds."   See, also, *Richardson* v. *Sibley*, 11 Allen 67; *Commonwealth* v. *Smith*, 10 Allen 455; *Middlesex R. R.* v. *Boston & Chelsea R. R.*, 115 Mass. 351; *Proprietors* v. *Railroad*, 104 Mass. 1; *Dam Corp.* v. *Ropes*, 6 Pick. 32; *Smith* v. *Smith*, 3 Dessaus. 557; *Steamboat Co.* v. *Dry Dock Co.*, 26 Am. R. 90; 2 Kent Com. 299; *Burritt* v. *New Haven*, 42 Conn. 175; *Ins Co.* v. *Ely*, 5 Conn. 572—*S. C.*, 2 Cowen 699; *Morris Coal Co.* v. *Barclay Coal Co.*, 68 Penn. St. 173; *State* v. *Railroad*, 29 Conn. 538; *Com. of T. Co.* v. *Railroad*, 50 Ind. 85; *Pittsburg & Steubenville R. R.* v. *County*, 79 Penn. St. 210; *Lawman* v. *Railroad*, 30 Penn. St. 42; *Troy & Rutland Railroad* v. *Kerr*, 17 Barb. 601; *Hoagland* v. *Railroad*, 39 Mo. 451; *Bank* v. *Pottery Co.*, 34 Vt. 144.   "Courts should require of the corporation, in all cases, to show plain and clear ground for the

authority they assume to exercise." *Williams* v. *Davidson*, 43 Tex. 2.

The reason for limiting corporations to and keeping them within their legitimate province is forcibly stated in 2 Potter's Law Corp., s. 541. "The number of these bodies increasing daily; the temptations to create them by the advantages of aggregating capital and by the resources of power and patronage they can command,—they have become a power in the land, controlling its material, commercial, and manufacturing interests, unequalled by any other, often influencing, and sometimes even overshadowing, the power and policy of the government itself. This view of the powers and influence of corporate bodies presents the necessity of the existence in our jurisprudence of the exercise of legal safeguards for the government and the people : this can now be exercised in the administration of the principles of law under that feature of it called *ultra vires.*"

*W. L. Foster*, for the Concord Railroad. The plaintiffs ask for an injunction to restrain the defendants from operating or meddling with the management of the Concord Railroad under the contract of August 19, 1881, between the Boston & Lowell Railroad Corporation and the Concord Railroad Corporation, providing for a "more economical joint operation and management of the said roads." The claim of the plaintiffs is, that the injunction should be granted without proof of their charges of fraudulent conspiracy; without proof of any actual damage done or likely to be done to their interests; before the legal rights of the parties are settled by a decision of the court on the merits; before any facts are shown which would be material to be considered on any question of law, and without inquiry into any other matters than the conceded facts that the plaintiffs are stockholders of the Concord Railroad; that such a contract has been made, and that the contracting parties have entered upon its performance in accordance with its terms,—contending that the contract was beyond the corporate powers of the Concord Railroad, and would be invalid even if made in good faith, and if beneficial to the plaintiffs. The proposition is, to exclude all evidence which may tend to explain the nature, meaning, intent, and purposes of the contract and its practical operation, and to procure a decree that it is void, merely upon the assertion of the plaintiffs that an inspection of the document discloses that it is "in violation of the public law of New Hampshire and the charter and by-laws of the corporation."

Without stopping to refute by argument the extraordinary suggestion that the court proceed to consider the question of the validity of this contract before any evidence is offered tending to show that the interests of the plaintiffs are endangered, and without entering upon the consideration of the wholesale charges of corruption, fraud, and unlawful conspiracy, we propose to submit cer-

tain legal considerations lying at the foundation of this investiga-
tion (broad and general as it must be, and not restricted as the
plaintiffs insist), which seem to deserve primary attention.   It is
true, as the plaintiffs allege, that "the railroad of the Concord
Railroad Corporation is thirty-five miles in length, and for a long
time has been, and still is, and of necessity must continue to be, a
necessary and natural outlet for the traffic of the said Northern
and Boston, Concord & Montreal railroads."   In other words, it
is true that the Concord Railroad, the Nashua & Lowell Railroad,
and the Boston & Lowell Railroad are parts of a connected line
and route of transportation extending from Massachusetts, through
New Hampshire, to Vermont and the Western States.   The pur-
pose of these roads and their connections is to provide for, pro-
mote, and facilitate the transportation of freight and passengers in
the way and by the means best calculated to promote the advan-
tage not only of the stockholders of the respective corporations,
but of the public; and such, the defendants are prepared to show,
is the object, and such will be the effect, of this contract.

The contract is said to be "in direct violation of the public law
of New Hampshire:" "No sale, lease, mortgage, or contract for
the use of any railroad shall be valid unless it shall be in writing,
filed in the office of the secretary of state, and authorized by the
legislature."   G. L., c. 159, s. 2.   "No contract between two or
more railroad corporations for the use of their roads shall be legal
or binding for a longer period than five years, nor unless sanc-
tioned in writing by the railroad commissioners, and approved by
the governor and council."   G. L., c. 164, s. 10.   The defendants
insist, and their answers and evidence will show (would have
shown before this time, if the plaintiffs had not by their objections
placed obstructions in the way and progress of the case, to the
unnecessary delay of its final determination), that the contract is
not in violation of any law of the state or the charter of the Con-
cord Railroad.   The defendants are charged with fraud and unlaw-
ful conspiracy, and their contract is pronounced illegal.   The plain-
tiffs ask the court to read the contract, take judicial notice of the
law, and pass judgment against the accused without further evi-
dence.   The court will not require us to accept this situation.
The accusations of the plaintiffs, in the absence of proof on their
part, are confronted by the presumption of the legality of the con-
tract.   The plaintiffs have the burden of proof, and no amount of
extravagant assumptions and assertions will sustain it.   The ordi-
nary rules of the construction of contracts apply to this instrument,
namely,—

1. It must be reasonably construed, according to the intention of
the parties.

2. The construction should be liberal.

3. And favorable, so that the agreement, if possible, be sup-
ported.

4. The popular meaning of words is to be adopted.

5. The whole contract is to be considered, and its subject-matter, in construing particular terms, which are to be understood in the sense most agreeable to the nature of it.

6. Although the construction and interpretation is for the court, parol and extrinsic evidence is admissible to aid that construction and interpretation. "Some evidence from without must be admissible in the explanation or interpretation of every contract." 2 Pars. Cont. 547, 549; Metc. Cont. 272, 277, 278, 285, 287, 303; Pott. Dwarris 177; Leake Cont. 119.

7. The contracts of a corporation are presumed to be *infra vires*. *Southern Express Co.* v. *Western N. C. R. R.*, 99 U. S. 191.

The burden of showing the incapacity of the corporations to make the contract is on the party denying its validity. And the inquiry is, not whether the contract was authorized, but whether it was forbidden. Whatever is not prohibited is permitted. *Taylor* v. *Chichester & M. R'y*, L. R. 2 Ex. 356, 462, 384. "There can be no doubt that a corporation is fully capable of binding itself by any contract except where the statutes by which it is created or regulated expressly, or by necessary implication, prohibit such contract. *Prima facie*, all its contracts are valid, and it lies on those who impeach any contract to make out that it is avoided. This is the doctrine of *ultra vires*, and is, no doubt, sound law." *Parke*, B., in *Scottish N. E. R'y* v. *Stewart*, 3 Macq. 382, 415; *Taylor* v. *Chichester & M. R'y, supra;* Brice's *Ultra Vires* 38–40; Green's Brice's *Ultra Vires* 37–40 and notes. Corporations have an implied power to make such contracts as are usual and necessary for carrying into effect the purposes for which they are created. Ang. & A. Corp., *s.* 271. A railroad corporation is sometimes authorized to make contracts by an express provision of statute; but in the absence of such a provision the power is implied as necessary and incidental to the express power to locate, construct, maintain, and work a railroad. The power, whether express or implied, must, in view of the purposes and methods of such an enterprise, be allowed a liberal scope. *South Wales Railway* v. *Redmond*, 10 C. B. N. S. 675, 685. "The company, by custom and necessity, conducts operations which are extensive and miscellaneous. It holds wide relations with local and general business. It is generally designed, not merely to convey passengers and goods upon its own road, but to be a part of an extended line of transportation. Its capacity to make contracts cannot, therefore, be measured by the narrow and rigid rules which were applied in an early day to business or commercial corporations." Its power, in respect to contracts and business dealings, extends not merely to those which are absolutely essential or indispensable to the performance of the specified acts authorized by its charter, but as well to those which, not being prohibited by statute or public policy, are designed and may be

useful to promote the main enterprise. It may enter into such contracts and transactions, incidental or auxiliary to its main business, as may become necessary, expedient, or profitable in the care and management of the property which it is authorized to control and manage under its charter. *Brown* v. *Winnisimmet Co.*, 11 Allen 326, 334; *Smith* v. *N. & L. R. R.*, 27 N. H. 86, 94; Pierce Railroads 499, 501, and cases cited. "It must be borne in mind that the courts in recent times have been extremely liberal in the construction of powers of railroad corporations to accomplish the general scope and objects of their creation, and that the question of *ultra vires* has not been of late years construed with the strictness that existed in former times." By the legislation of many states, general authority is given for the sale, lease, or consolidation of railroad corporations; and in others, where such authority is not in terms conferred, great encouragement has been given to the union of lines of railroad for the purpose of having them operated under some general management. *Dimpfel* v. *Ohio & Miss. R'y*, 9 Biss. 127. Great liberality in this direction characterizes the legislation of parliament, and the construction thereof by the English courts. "Railway Clauses Consolidation Act" (1845), 8 Vict., *c.* 20; *S. Yorkshire R'y & River Dun Co.* v. *Gt. Northern R'y*, 3 DeG. McN. & G. 576; Browne & Theobald Railway Companies 293; Green's Brice's *Ultra Vires* (2 ed.) 421. "A corporation, owning and operating a railroad making a continuous line with that of another corporation, may, it seems, irrespective of any special provision of its charter, lawfully contract with the latter company for the joint purchase and ownership of locomotives to be used on both roads. If otherwise, the power is implied in a legislative provision for the connection of the first railroad with a point at the further end of the second, 'by railroad, canal, or slack-water navigation.'" *Olcott* v. *Tioga R. R.*, 27 N. Y. 546, 560.

If railroad corporations may thus contract for the ownership and use of locomotives, where is the limitation with regard to property? Upon the general subject of the powers of railroad corporations in respect to mutual contracts, reference may be had to Green's Brice's *Ultra Vires* 409–426 and notes. The principle, clearly established on both sides of the Atlantic, is, that the powers of railroad corporations to contract with each other for transportation upon and the general management of connecting roads, are, and from the demands and necessities of business must be, allowed all the freedom consistent with public policy as declared by law.

There is a wide distinction between the condition of these contracting parties, and the circumstances contemplated by the provisions of Gen. Laws, *c.* 158, *ss.* 11–13. Neither of the contracting parties, nor the northern roads with which they connect, are parts of rival or competing lines, and as such open to the objections considered in *Currier* v. *Concord R. R.*, 48 N. H. 321, 325, and *Morrill* v. *B. & M. R. R.*, 55 N. H. 531. And the provisions of

Gen. Laws, c. 158, s. 11, requiring the sanction of the legislature and the approval of the governor and council for the validity of a contract for the consolidation of rival or competing lines, have no application; because, by s. 13 of the same chapter, the prohibition of the law is declared not to apply to "contracts or leases for the running and operation of any road constructed as an extension or continuation of a separate and independent line, or as parts and parcels of the same, or to any side branches tributary or secondary to such line, all which are specially exempted from the provisions of" the prohibitions contained in s. 11.

The contract is in no sense an arrangement for consolidation. Consolidation is the American term which takes the place of the English word "amalgamation," which means the sale or transfer of the assets of one company to another, and the commutation of the shares of one company into those of another, whereby membership in the new company is substituted for membership in the old; though it is said the term "amalgamation," as commonly used in English law, has a wider meaning than consolidation has with us. But the American use of the word implies the dissolution of two or more corporations and the creation of a new corporation, with stockholders, property, and liabilities derived from the corporations passing out of existence. Green's Brice's *Ultra Vires* 631; *McMahan* v. *Morrison*, 16 Ind. 172; *State* v. *Bailey*, 16 Ind. 46; *Shields* v. *Ohio*, 95 U. S. 319. Any other use of the term is meaningless and inconsiderate, though doubtless common enough, and is thoughtlessly regarded as comprehending all sorts of mischief. By the terms of the contract the idea of amalgamation, consolidation, or partnership is expressly repudiated, and the agreement is declared to be in no sense a lease, or a union of corporate powers or privileges; but each party retains to itself all its chartered rights and liabilities. Art. 1. These terms are not mere figures of speech, but are expressions of the understanding and intention of the contracting parties; and while it is true the nature of things is not changed by the application of definitions, parties may and do bind and estop themselves by a declaration of their assumed powers and purposes. The contract, therefore, is not within the terms or intendment of Gen. Laws, c. 158, s. 11.

Neither is it within the provisions of Gen. Laws, c. 159, s. 2, or c. 164, s. 10. It is not a sale (which requires a vendor and a purchaser, and a consideration of price paid), nor a lease (which requires a lessor and a lessee, and a stipulated rental), nor a mortgage (which requires a mortgagor and a mortgagee, and a condition), nor a contract for the use of a railroad (which contemplates the surrender, to a greater or less extent, of the control of one road to that of another), but it is precisely, and in good faith, what it purports to be,—a "business contract only," the result of "a joint business, passing over the roads and through the hands of both parties, making desirable a common policy and unanimity of

management." Its object is the promotion of the mutual interest of the parties "through a more efficient and more economical joint operation and management of said roads, and for the better security of their respective investments, as well as for the convenience and interest of the public." That it is in fact what it is declared to be we expect to demonstrate by the evidence which the plaintiffs desire to exclude. If the nature, purpose, and scope of the agreement are such as is thus declared by the contracting parties, their contract is not repugnant to the provisions of any "public law" of the state, nor (as we shall presently discover) to the limitations of the charter of the Concord Railroad.

Contracts relating to traffic between connecting roads, the manner of conducting it, and the division of the profits, "when made with a *bona fide* purpose to regulate traffic in a reasonable and just manner, are generally held good." The division of the tolls and fares, in such a case, may be according to any plan which is agreed upon, and need not be based upon the relative distances traversed by connecting roads. The receipts may be divided by an arbitrary schedule fixed upon, not always, or in most cases, giving to each line the share earned on it, and that only. "In many cases there may be good reasons for making a difference in the division of the profits. If an advantageous arrangement can be made by a line at the south end of a route with a line at the north end, for carrying passengers in common, which could not profitably (and therefore would not) be entered into by the north line unless it received a larger proportion of the earnings than in proportion to its work, there is no reason or principle of law why the south line should be prohibited from making an arrangement profitable to its stockholders, on the ground that the division of the earnings must be unequal. The directors of such companies have the right to make contracts as to carrying passengers and freight. Such contracts, when made in good faith and for the supposed advantage of the business and of the stockholders, are reasonable, politic, and lawful. The expediency of making them must depend on the judgment of some one, and in all railroad corporations the management of all the concerns is committed to the directors. The want of the power to make such contracts would be a great injury to most railway corporations, as well as to the public, who (as will be shown in this case) are much benefited by the arrangement. *Stewart* v. *E. & W. Trans. Co.*, 17 Minn. 372; *Sussex R. R.* v. *Morris & Essex R. R.*, 19 N. J. (Eq.) 13—*S. C.*, 20 *id.* 542; Green's Brice's *Ultra Vires* 415, 416, *note*. It is held in England that agreements providing for the division of profits arising from the whole existing traffic of a line in proportions calculated on the past course of traffic are not *ultra vires* or otherwise void. *South Yorkshire R'y & River Dun Co.* v. *Gt. Northern R'y*, 9 Ex. 55. But the plaintiffs, by their bill, make no complaint about the division of the net income of the traffic. If they shall hereafter specify

an objection of this character, we shall·be prepared to meet it, and to show, among other things in that connection, that the method of division ensures to the Concord Railroad a proportion of the net income fully as large as has heretofore accrued to them under previously existing arrangements.

We are not called upon at present to consider in detail all the provisions of this contract. If in any specific part it shall ultimately be held illegal or invalid, such part may be rejected or modified. It is sufficient for the present inquiry to meet and answer any evidence tending to show that the general scope of the contract is not contrary to the provisions of any law of the state. The only evidence presented by the plaintiffs is the contract itself. Until we shall have had an opportunity to present the testimony essential to the fair interpretation and understanding of the contract in respect to its practical operation, we can only consider briefly, and in a general way, the specified objections named in the bill.

The charges, that the defendant directors (or some of them) have but little personal pecuniary interest in the stock or successful operation of the Concord Railroad; that they have large interests in rival roads; that the corporations designated as rival and competing are such in fact; that the directors of the Concord Railroad were elected on account of their interest in and partiality to other and rival roads; that the provisions of the contract are injurious to the interests and destructive of the rights and property of the Concord Railroad and its stockholders; and the general and indefinite charges of fraud and conspiracy,—are not, we submit, sustained by mere inspection of the contract, but are subjects of proof, the burden of which rests on the complainants. When the defendants are called upon to answer the bill, each and all of these charges will be unqualifiedly denied.

The first complaint worthy of present attention is that which relates to Articles II and IX of the contract, which are said to provide for a delegation of authority not recognized or authorized by the charter of the Concord Railroad. The charter (Private Acts of 1835, c. 1), in its second section, provides that " the immediate government and direction of the affairs of said corporation shall be vested in seven directors "—a provision not peculiar, but common to all corporate grants. Article IX of the contract provides that " the joint roads shall be operated by a general manager, who shall be chosen by the concurrent vote of a majority of the directors of each party, and may be removed in like manner, or by the unanimous vote of either board; and the respective boards of directors shall, by such concurrent action, exercise the same control over the management as is usual with boards of railroad directors in ordinary cases." It is claimed that this is a delegation of the authority of the directors to an authority (the general manager) selected by a foreign corporation. It is manifest that all the practical manage-

ment, in detail, of the business of a railroad is, and of necessity must be, in a certain sense, delegated by the directors, who exercise only a general government and direction over the affairs of the corporations. Directors of a railroad corporation never did and never can personally manage and operate the running of a railroad. Invariably and of necessity they act through agents; and the agency, comprehending the immediate control of the "shops, depots, furniture, rolling-stock, machinery, tools," &c., is always vested in a superintendent or manager, and his sub-agents   Can there be any doubt that the directors of two connecting railroads may both appoint the same person as superintendent or manager? Where is the provision of law, or public policy, or good management, which forbids such an appointment?

There is no legal or reasonable objection to two or more connecting railroads having one or more common directors. There are probably few extended lines of connecting railroads in the country where such representation does not exist. They are found in most of the New England states as well as the larger states of the West. I am not aware that the legal validity of such conditions has ever been denied; and such conditions and such an arrangement, assuming the honesty and capacity of the directors, seem for obvious reasons desirable. In such cases, the directors themselves of one road may be said to exercise immediate control of the management of another road.

If the directors of either company may delegate the management of the practical running of the road to an agent, by whatever name, "manager" or other, he may be called, and two boards of directors may appoint the same person as manager, it would seem they may do it by concurrent vote, not of a majority of one board acting with a minority of the other board, but by the votes of a majority of each board; and that the manager may be removed in like manner. In such case, the manager is appointed by each board. The Boston & Lowell corporation cannot appoint a manager of the Concord Railroad without the consent and the action of the appointing power conferred upon the directors of the Concord corporation. Neither board delegates the power of appointment to the other. The manager may be removed by the unanimous vote of either board; that is to say, the board of directors of each road, with whom the power of appointment and removal is invested, have, in the exercise of their authority to manage the concerns of their own road, agreed that they will not retain a general manager who shall be obnoxious to the other contracting party. If two or more connecting railroad corporations may jointly own and possess locomotives and other property, and jointly use the same on their common route (as we have seen they may), why may they not jointly employ the agents controlling and managing that property? We fail to discover in this arrangement any illegal delegation of directory power.

The cashier is appointed and may be removed in the same way. But, concerning the character and effect of the provisions of the contract relating to the cashier, it will appear, when the evidence is submitted, that the plaintiffs' "information and belief," and their fearful apprehensions, are wholly without any foundation in fact. The plaintiffs charge that the defendants "have transferred and are transferring all the moneys and earnings of the Concord Railroad from the hands and possession of the treasurer, agents, servants, and employés of said Concord Railroad to the possession and custody and into the control of said cashier," etc.   But it will be shown that exactly the reverse of this is being done.   It is manifest that no treasurer of a railroad corporation ever does or can receive immediately the moneys of the corporation.   These all come, in the natural course of business, first into and then through the hands of various subordinate officers,—conductors. ticket-sellers, and various other officers,—into the custody of the treasurer. The office of treasurer is by no means dispensed with, nor are his powers, duties, or responsibilities abridged or curtailed in any way by or through the intermediate agency of the cashier.   The care and custody of the finances of the joint management are, by the terms of Art. X of the contract, confided to a cashier for temporary purposes only, just as the care and custody of the finances of the Concord Railroad have always been confided to the cashier of the Concord Railroad for temporary purposes only,—with the difference, that under the present management the penal sum of the cashier's bond (formerly $15,000) has been raised to $30,000.   The bond required is "such suitable bond for the performance of his trust as may be prescribed by the directors of each corporation;" and, in compliance with such requirement, the present cashier has given to the Concord Railroad his bond in the sum of $30,000, with abundantly sufficient sureties, approved by the directors of the Concord Railroad, which bond is lodged with the general manager, himself a director of the Concord road.   The cashier's temporary custody of the finances of the corporation, in compliance with the terms of Art. XXIV, is transferred to the treasurer of the respective corporations at the close of each month.

By Art. XI it is provided that no changes in the local or through rates for transportation shall be made without the approval of the directors of the local road so interested and the joint management. The complaint in this particular is, that a foreign corporation may interfere in the regulation of the local and through freights in which, on account of the business connection of the roads, such foreign corporation, one of the contracting parties, is interested.   But such regulations, by mutual agreement, have always been made and must necessarily exist in every case in which two or more connecting roads conduct the business of through transportation; and the validity and the reasonableness of such arrangements have never been doubted.   Unless the local and through rates are arranged

by mutual agreement, and remain thus fixed until changed by mutual consent, disastrous competitions and collisions will ensue. For example : If the price of a passenger ticket from Concord to Boston has been established by the three connecting roads forming the line between those two places, at $1.00 from Concord to Nashua, + 50 cents from Nashua to Lowell, + 50 cents from Lowell to Boston, = $2.00, it would not be fair for the Boston & Lowell Railroad, without the consent of the Concord Railroad, to agree to carry passengers from Lowell to Boston for 25 cents, or to raise the local fare to 75 cents.    If the Boston & Lowell road should do this, the Concord road must necessarily reduce or raise the price of a through ticket accordingly ; otherwise, in case of the reduction by the Boston & Lowell road, the through passenger would buy a ticket only to Lowell, and the Concord road would lose its just proportion of the profit of carrying the passenger from Lowell to Boston.    But it is sufficient to say that the directors, to whom the general control of the affairs of the corporation is entrusted, have the power, acting honestly and for the supposed advantage of their own road, to agree with another road as to what the rates of transportation shall be, and whether or not, and to what extent, if any, they shall be increased or diminished.    By such arrangement neither party parts with its corporate power. *Columbus &c. R. R.* v. *Indianapolis &c. R. R.*, 5 McLean 450, 454.

Complaint is made with regard to the method agreed upon for the settlement, by arbitration, of matters of disagreement arising under the contract.    That directors of corporations may refer all disputes and controversies to arbitration, and to such arbitrators as may be agreed upon, in good faith, will not be denied.    Morse on Arb. 5.    The charge that Mr. Hayes is not an impartial arbitrator is a charge that requires proof ; that he has merely a nominal interest in the Concord Railroad, that he has large interests, or any interests whatever, as stockholder, creditor, or debtor, in the Boston & Lowell Railroad or in any rival roads, whose interests are adverse to the Concord Railroad, is also a matter of proof ; but the charge is denied, and the fact is the reverse of the plaintiffs' assertion.    The objections suggested to Art. VI are all based upon the unwarranted assumption not only that the directors of the Concord Railroad are "interested adversely" to the corporation and its stockholders, but also that they are dishonest and corrupt. The court will require proof of these charges, and substantial evidence that the fears of the plaintiffs are not groundless.    The leases and contracts indicated by the terms of this article must, of course, be legal leases and contracts ; and the provision, that no such lease or contract shall be made as shall reduce the joint income of the contracting parties without the sanction of the board of directors of each party, would seem to afford reasonable security to the interests of the stockholders of the Concord Railroad.    The same considerations apply to all the suggestions of

possible detriment to the plaintiffs, through improvident, injudicious, or fraudulent management, including the matter of the rental of the Massachusetts Central Railroad. The directors of these several connecting roads are entrusted by law with the management and "direction of the affairs" thereof. If their management shall be deemed by the stockholders improvident or injudicious, the stockholders will apply the remedy. If their contracts are invalid, they will be so declared. If themselves are dishonest, corrupt, or fraudulent, the law will control and punish them.

In general terms, the charge is preferred that this contract provides for the surrender of the control of the Concord Railroad to the Boston & Lowell Railroad; that it provides for the use of the former road by the latter corporation. If under the provisions of this contract the surrender of the use of one road is made to the corporation of the other road, which is the road surrendered to the other? This suggestion has been incidentally and sufficiently referred to in the preceding discussion. But what is really the relative position of these corporations and their roads and business? The Boston & Lowell and the Concord railroads are parts of a continuous connecting line, extending from Boston, through New Hampshire, to Vermont and the West. The local business of the roads (by which is meant the business originating and terminating in the same state and upon one road) is very small in amount as compared with the through business of the line, the business originating in one state and terminating in another. For example, it will be shown that the amount of through and local freight tonnage on the Concord Railroad for five years ending March 31, 1881, was as follows:

| | |
|---|---:|
| The Concord road carried to and received from the lower roads, | 730,682,944 lbs. |
| The Concord road carried to and received from the upper roads, | 510,783,878 lbs. |
| The lower roads carried to and received from the upper roads, | 4,380,630,604 lbs. |
| Total, | 5,622.097,426 lbs. |

The local tonnage upon the Concord road was 440,090,224 lbs. The through tonnage was about 92¾ per cent., and the local tonnage about 7¼ per cent., of the whole freight business. The local business, important in itself and with respect to local customers of the road, is but an incident to the main business of the line; but it is necessarily, in the management of the trains, cars, and servants of the road, so intermixed with the through business, that any arrangement contemplating the through business must, of necessity, carry with it and include an arrangement for the local business, both classes of business being transacted upon the same trains, and by means of the same employés and agents. No two

connecting roads can be conveniently, economically, or successfully managed, either in the interest of the corporations or of the public, without the common use of the property of the connecting roads. Every time a car runs from one road to another, or a brakeman or conductor runs from one road to another, these cars and agents are necessarily employed for the common benefit of the connecting roads; and if the law prohibited the running of the cars of one road from that road to and over another road, the transfer of passengers and freight at the terminal connection of the two roads would necessarily involve, to a great extent, the common use of the property of the two roads. From the earliest institution of railroads the cars of connecting roads have been run, those of each over the road of the other, for the convenience of the public as well as of the corporations, in order to save the trouble, delay, and expense of the transfer of passengers and freight. It is obvious that any other mode of operation would involve great expense and inconvenience. The question, therefore, seems to be, not whether there may be a common use, but what shall be the extent of that common use.

Since the earliest introduction of railway traffic into the state, contracts have been habitually made whereby the cars and servants of one corporation have been run over the railroad of another No instance can be found in which such contracts have been submitted to the approval of the governor and council or the railroad commissioners, and no suggestion has heretofore been made that such contracts required such approval. But if the construction claimed by the plaintiffs be correct, no one among the hundreds of contracts providing for connecting business between railroads has been executed in this state since 1850 (Laws of 1850, c. 953, s. 8), without a violation of our state law.

The statute of 1855 sanctioned and required the common use, by two connecting roads, of the cars and passengers of each, and did not prohibit, but, on the contrary, by plain intendment, authorized, a contract between connecting roads, by which the one road should use the other as well with its locomotives and servants as with its engines and cars. Laws of 1855, c. 1666, s. 2. This provision of law has been reënacted, and is still in force. G. L., c. 164, ss. 1, 2. The germ of this statute is found in Rev. Sts., c. 142, s. 10, concerning contracts between railroads for doing connecting business, and concerning the terms of connection. The law of 1850, above cited, did not repeal the foregoing provision of the Revised Statutes, but had reference to a different class of contracts. This is indicated by Laws of 1851, c. 1113, entitled "An act to provide a mode of adjustment of the terms of connection between railroads," which provided, not that the contract between the roads be submitted to the governor and council, the railroad commissioners, or the legislature, but "that in all cases where railroads are unable to agree upon terms of connection, or on referees

to whom the same be submitted," either road may apply to the court for the appointment of referees "to adjust and determine all matters of connection between the parties for such term as said referees may award, not exceeding one year, or such further time as the parties may agree upon." This act was repealed in 1855 by the statute before cited (Laws, *c.* 1666), entitled "An act relating to the connection of railroads," the latter act also containing a similar provision with regard to the submission to referees of questions concerning the terms of connection and matters of disagreement, such referees to be appointed in the same manner as provided by the act of 1851. By the act of 1856 (Laws, *c.* 1847), the act of 1855 is applied "to all railroads chartered by the legislature of this state which connect with any other railroad chartered by the legislature of this state, or by the concurrent action of the legislature of this state and any other state or states, notwithstanding neither of said connecting roads are by law authorized to unite with or enter upon and use the other."

Gen. Laws, *c.* 164 (except the last section, which has reference to a contract of a different character from that contemplated by the previous sections), is substantially a reënactment of the acts of 1855 and 1856, as indicated by the marginal references; and this law (*c.* 164, *ss.* 1, 9), now in force, contemplates no action by the legislature, or the governor and council, or railroad commissioners, but provides for a reference (in case the parties are unable to agree), as in the preceding laws on the same subject. The marginal references to Gen. Laws, *c.* 164, *s.* 10, are incorrect, through a mistake of the printer or the compilers. " R. S. 146 : 10 " should be R. S. 142 : 10 ; and "1853, 953 : 8" should be 1850, 953 : 8. The use contemplated by Gen. Laws, *c.* 164, *s.* 10, is not an arrangement of the character provided for by the contract under consideration, but is such a use as involves the surrender, to a greater or less extent, of the control of its railroad by one corporation to another. A use that is made of one road by the cars and locomotives of another corporation, under the control of the officers and agents of the road thus used for the convenience of the connecting business, is not a use forbidden by statutes. But the use contemplated by the last named statute is where one railroad is used by another corporation, subject to the control of the user,—like the common use, for example, of the Essex Railroad, between Peabody and Salem, Mass., by the Boston & Lowell and the Eastern railroads, for their separate convenience and necessities. If contracts like that under consideration, relating to the connecting business between railroads, had been intended by the statute last referred to, such intention would have been expressed in terms so plain as not to have required the experience of forty years to discover the prohibition of the law.

Here is a contract which, in effect, provides that the same person shall be the general manager of each of the connecting roads.

His management, with reference to the control of either road, is a management with which he is entrusted by the directors of the corporation controlling that road, and is the management of the directors of that road by their lawfully appointed agent.   Here is a contract providing for the common use of property of connecting roads, in the interests of convenience, efficiency, economy, and the public good.   It may be said, the common use of the separate property of the roads is more extensive than has heretofore been exercised; but if contracts may be made, such as have heretofore always been regarded as lawful, concerning the use of the cars of one corporation by another, if connecting railroads may lawfully contract with each other for the joint purchase and ownership of locomotives to be used on both roads ( *Olcott* v. *Tioga R. R.,* *supra* ), upon what principle of law or logic shall a similar use of other property essential to the advantageous operation of the through business, and the employment, by mutual agreement, of the same agents and servants, such as brakemen, conductors, &c., by both parties, be excluded ?   And why may not such an arrangement be made, in good faith and in the exercise of the discretionary power vested in the contracting boards of directors, with regard to the local traffic, necessarily managed in connection with the through traffic, as shall seem to be for the best interests of all concerned therein ?

With one other suggestion, this branch of the discussion, in many respects, no doubt, premature, is suspended.   Considering the obvious impossibility, by reason of the mixed nature of the traffic, of making other than an arbitrary, approximate separation of the expense of the local from that of the through business, it would seem that an arrangement providing for a division of the joint income of the whole traffic, by an agreed percentage, determined with reference to the results of the previous mutual dealings of the parties, and established by the consenting judgment and discretion of those having charge, by law, of the prudential affairs of the contracting corporations (a judgment and discretion exercised with a view to the interests of all the stockholders and of the public—interests necessarily combined, and in a large degree identical), is no more objectionable than the conceded validity of an arrangement by which one corporation shall pay to the other a given sum for doing the connecting business of its road.   We contend, therefore, that the provisions of Gen. Laws, *c.* 159, *s.* 2, and *c.* 164, *s.* 10, have no relation to this contract.

If applicable at all, they cannot be applied to a contract of this nature, between corporations, parts of a continuous line of through transportation, extending from one state into another.   If thus applied, the statutes themselves are invalid, so far as they relate to or affect a railroad connected in a continuous line with a railroad in another state, because they are repugnant to the constitution and laws of the United States.   " This constitution and the laws

of the United States which shall be made in pursuance thereof * * * shall be the supreme law of the land; and the judges of every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U. S. Const., Art. VI. The federal constitution is of complete obligation, and binds state sovereignties. The laws of congress made in pursuance thereof suspend or overrule all state laws with which they are in conflict, and the latter are void and nugatory so far as the supreme law extends. The nullity of any act inconsistent with the federal constitution and laws is produced by the declaration that the constitution is the supreme law. The state laws are annihilated, so far as the ground upon which they stand is occupied by the laws of the Union. *M' Culloch* v. *Maryland,* 4 Wheat. 316; *Gibbons* v. *Ogden,* 9 Wheat. 1; *N. R. Steamboat Co.* v. *Livingston,* 3 Cow. 713, 716; *Metropolitan Bank* v. *Van Dyck,* 27 N. Y. 400, 469; *Pierce* v. *The State,* 13 N. H. 536, 553. By the federal constitution, power is conferred upon congress " to regulate commerce with foreign nations and among the several states, and with the Indian tribes." U. S. Const., Art. 1, *s.* 8. Chief-Justice *Marshall,* in the historical case which embodies an exposition of this clause of the constitution, has adopted a definition of the term " commerce," as used in that instrument, which for nearly three quarters of a century has been regarded as settled. " Commerce, as the word is used in the constitution, is a unit, every part of which is indicated by the term." *Gibbons* v. *Ogden, supra; Lin Sing* v. *Washburn,* 20 Cal. 534. It is not limited to traffic, to buying and selling, or to the interchange of commodities, but " all America understands and has uniformly understood the word ' commerce ' to comprehend navigation. It was so understood when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted the government, and must have been contemplated in forming it. The convention must have used the word in that sense, because all have understood it in that sense, and the attempt to restrict it comes too late." *Gibbons* v. *Ogden, supra.* Commerce is intercourse as well as traffic, commercial intercourse between nations and parts of nations. *Gibbons* v. *Ogden, supra; United States* v. *Bailey,* 1 McLean 234; *The Daniel Ball,* 10 Wall. 557; *M' Culloch* v. *Maryland, supra; Groves* v. *Slaughter,* 15 Pet. 449; *Brown* v. *Maryland,* 12 Wheat. 419; *United States* v. *Holliday,* 3 Wall. 407; *Mitchell* v. *Steelman,* 8 Cal. 363; *People* v. *Brooks,* 4 Den. 469, 476; *N. R. Steamboat Co.* v. *Livingston, supra; Moor* v. *Veazie,* 32 Me. 343, 363–365; *Corfield* v. *Coryell,* 4 Wash. C. C. 371; *State* v. *Delaware &c. R. R.,* 30 N. J. (Law) 473; *State Freight Tax Cases,* 15 Wall. 275; *The Clinton Bridge,* 10 Wall. 454.

The power conferred upon congress is to regulate commerce " among the several states." "A thing which is among others is intermingled with them. Commerce among the states cannot stop

at the external boundary line of each state, but may be introduced into the interior." The states of the federal union either join each other, in which case they are separated by a mathematical line, or they are remote from each other, in which case other states lie between them. Trading intercourse among the states must commence in one state and terminate in another, and the power of congress must therefore be exercised within the territorial jurisdiction of the several states. What is this power? It is the power to regulate, that is, to prescribe, the rules by which commerce is governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution. It comprehends navigation and other means of commercial intercourse within the limits of every state in the Union, so far as those means of intercourse may be in any manner connected with commerce among the several states. These general principles, declared in 1824, were made applicable to intercourse upon navigable waters and to vessels propelled by steam, as well as to those navigated by the instrumentality of wind and sails. *Gibbons* v. *Ogden, supra.* That they have been applied to the modern means of traffic and intercourse by the instrumentality of railroads as well as to telegraphic communication (*West. Union Tel. Co.* v. *Atlantic & Pacific Tel. Co.,* 5 Nev. 102; *Pensacola Tel. Co.* v. *W. U. Tel. Co.,* 2 Woods 643) we shall presently see. The sovereignty of congress, being plenary as to the powers conferred by the constitution, is vested absolutely in that branch of the federal government. The grant by the constitution to congress of the power to regulate interstate commerce carries with it the whole subject, leaving nothing for the state to act upon. The power is exclusive: it can reside in but one potentate. And "wherever commerce among the states goes, the power of the nation goes with it, to protect and enforce its rights." *Gilman* v. *Philadelphia,* 3 Wall. 713, 725. But when a state proceeds to regulate commerce among the states, it is exercising the very power that is granted to congress, and is doing the very thing that congress alone is authorized to do. *Gibbons* v. *Ogden, supra—S. C.,* 5 Pet. 571, 588; *Brown* v. *Maryland, supra; Pollard* v. *Hagan,* 3 How. 230; *Passenger Cases,* 7 How. 283; *Cooley* v. *Port Wardens,* 12 How. 299; *The Genesee Chief* v. *Fitzhugh,* 12 How. 443; *Veazie* v. *Moor,* 14 How. 568; *Sinnot* v. *Davenport,* 22 How. 227; *Groves* v. *Slaughter, supra; Blanchard* v. *The Martha Washington,* 1 Cliff. 473; *In re Ah Fong,* 3 Sawy. 145; *Willson* v. *Blackbird Creek Marsh Co.,* 2 Pet. 245, 252; *The People* v. *Brooks, supra; The Barque Chusan,* 2 Story 455; *Jolly* v. *Terre Haute Bridge Co.,* 6 McLean 237; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Paul* v. *Virginia,* 8 Wall. 168, 182; *Welton* v. *Missouri,* 91 U. S. 275; *Henderson* v. *New York,* 92 U. S. 259; *Pensacola Tel. Co.* v. *W. U. Tel. Co.,* 96 U. S. 1, 9; *Pierce* v. *The State,* 13 N. H. 536, 577; *City of Council Bluffs* v. *Kansas &c. Railroad,* 45 Iowa 338;

*Pennsylvania* v. *Wheeling Bridge*, 18 How. 421; *The United States* v. *The Railroad Bridge Co.*, 6 McLean 517, 523; *Corfield* v. *Coryell*, 4 Wash. C. C. 371, 378, 379; *The Montello*, 20 Wall. 430, 439, 442; *County of Mobile* v. *Kimball*, 102 U. S. 691, 696, 697; *Webber* v. *Virginia*, 103 U. S. 344, 350, 351; *Hall* v. *De Cuir*, 95 U. S. 485, 488, 489; *People* v. *Raymond*, 34 Cal 492; 2 Story Const., *ss.* 1052, 1069; 1 Kent Com. 436, 437; 1 Redf. Railways (5 ed.) 720, 727; Cooley Const. Lim. 65; 1 Walker Am. Law. 138, 141.

The transportation of freight or of the subjects of commerce is a constituent part of commerce itself. Transportation of passengers or merchandise through a state, or from one state to another, is the subject of a regulation of commerce among the states, and is beyond the reach of state legislation. This power of congressional regulation comprehends the routes and means of travel, transportation, and commercial intercourse within the limits of every state in the Union, so far as those routes, means, and intercourse are connected with commerce among or between the states. *Crandall* v. *Nevada*, 6 Wall. 35; *Woodruff* v. *Parham*, 8 Wall. 123, 138; *The Montello*, 11 Wall. 411; *The Daniel Ball, supra*, in which case Mr. Justice *Field* remarks,—" Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several and independent agencies are employed in transporting the commodity, some entirely in one state and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in the transportation it is subject to the regulation of congress." *Case of the State Freight Tax*, 15 Wall. 232, 275, 279–281; *Erie Railway* v. *The State*, 31 N. J. (Law) 531; *Piek* v. *Chicago & N. W. Railway*, 6 Biss. 177, 182; *Camblos* v. *P. & R. Railroad*, 4 Brews. (Penn.) 563, 603; *Pennsylvania* v. *Bridge Co., supra;* *Almy* v. *California*, 24 How. 169; *C. B. & Q. Railroad* v. *Iowa*, 94 U. S. 155, 163. This power was vested in congress to ensure uniformity of commercial regulation against discriminating state legislation. *Veazie* v. *Moor, supra; Welton* v. *Missouri, supra;* The Federalist, Nos. 7, 11, 22 (ed. 1852), 31, 52, 97. And the fact that congress has not seen fit to prescribe any specific rules to govern interstate commerce, especially when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammelled. *Railroad* v. *Fuller*, 17 Wall. 560; *Welton* v. *Missouri*, 91 U. S. 275, 282.

I suppose the legislation of New Hampshire now under consideration will not be claimed to be an exercise of internal police power *(Pierce* v. *The State*, 13 N. H. 536, 579. If it were such it could not be exercised by the state, to the obstruction of interstate commerce. *Railroad* v. *Huzen*, 95 U. S. 473), nor that it has

reference to a commerce which is completely internal.   If such a
position shall be assumed by the plaintiffs it will be considered
hereafter.   In the meantime, for a definition of the extent and
characteristics of state police power and regulation, see *P. W. &
B. Railroad* v. *Bowers*, 4 Hous. (Del.) 506, 537 ; *Thorpe* v. *R. &
B. Railroad*, 27 Vt. 140.

The provision of the United States constitution concerning com-
merce among the states was not intended to be confined to future
commerce carried on in the same mode it then was, before the
introduction of steam as a motive power.   And it was so held, as
we have seen, in the early days of steam navigation, in the case of
*Gibbons* v. *Ogden*, where the term " regulation of commerce " was
declared to embrace the whole thing, with all its means, instru-
ments, and appliances.   The constitution and the laws of congress
never had in contemplation the principle by which vessels or car-
riages are moved.   Concerning, therefore, the application of the
constitutional provision to modern means of traffic and transporta-
tion, Mr. Justice *Redfield* remarks,—" It is thus made very appar-
ent, from a careful examination of the argument in *Gibbons* v.
*Ogden*, by which transportation of goods and passengers by steam-
boats and steam vessels of every kind is brought under the same
provisions originally framed for the regulation of that which was
carried on by sailing vessels, that if the question had then presented
itself to the mind of the court how far railway traffic should be
brought under the same power of regulating commerce which had
already been extended to the traffic by navigation, there can really
be no fair doubt how it would have been determined.   The fact
that the entire subject of regulating all commerce among the dif-
ferent states, including all the means and appliances by which it
was carried on, was committed to congress, and that thereafter
the states were to have no concurrent action in the regulation of
the same, would seem to reduce the question of congress having
the power of regulating interstate railway traffic to the single in-
quiry whether it forms any portion of the commerce of the country
which requires to be regulated at all.

" Those who assume to argue that congress has no power to regu-
late the traffic upon these extended lines of railway, reaching from
one end of the Union to the other, must, if they would meet the
question fairly, either say that the traffic on these extended lines of
railway, amounting to many millions annually, probably ten times
as much as the entire commerce of the country at the time of the
adoption of the constitution, is not commerce at all, or, if it be, that
it is not subject to any regulation or control whatever.   For it is
certain the states have neither the power nor the capacity to regu-
late, to any purpose or with any efficiency, this interstate railway
traffic."   1 Redf. Railways 723.

Mr. Justice *Cooley* also remarks,—" The principles that at one
time applied the power over commerce to the regulation of naviga-

tion, at a later day are found equally applicable to traffic by railroad [citing *Railroad Co.* v. *Richmond*, 19 Wall. 584] and communication by telegraph; and though these new applications of principle do not in the least depart from or enlarge former doctrines, they nevertheless strengthen greatly the national power by the immensity of the interests it is thus invited to take under its control." Cooley Const. Law 38.

Transportation and intercourse by railroad between different parts of the country are under the regulating control of congress wherever they are not exclusively limited to a single state; and under this power congress may provide for the construction and operation of connecting lines. These powers of regulation "keep pace with the progress of the country, and adapt themselves to the new developments of times and circumstances. They extend from the horse with its rider to the stage-coach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation, it is not only the right but the duty of congress to see to it that intercourse among the states and the transmission of intelligence are not obstructed or unnecessarily encumbered by state legislation." Cooley Const. Law 65, 67; *Pensacola Tel. Co.* v. *W. U. Tel. Co.*, 96 U. S. 1, 9. Congress cannot legislate for the regulation of commerce on a railroad exclusively within the limits of a state, and which does not, by connecting with other railroads, form a continuous route over which commerce is or may be carried on with other states. *Veazie* v. *Moor*, 14 How. 568. It is otherwise, however, with a railroad which, though wholly within a state, forms, with connecting roads, a highway for interstate commerce; and the regulation may extend to vehicles and means of transportation, which, even if they be used upon the railway of one state, yet deliver merchandise upon the connecting road. Cooley Const. Law 67; *The Daniel Ball, supra; Withers* v. *Buckley*, 20 How. 84; *The Bright Star*, 1 Woolw. 266; *The Montello*, 20 Wall. 430.

The act of congress of June 15, 1866 (14 U. S. St. at Large, *c.* 124), is entitled "An act to facilitate commercial, postal, and military communication among the several states." Its preamble is as follows: "Whereas, the constitution of the United States confers upon congress, in express terms, the power to regulate commerce among the several states, to establish post-roads, and to raise and support armies; therefore" etc. This statute is re-enacted by U. S. Rev. St., *s.* 52, 5258, as follows: "Every railroad company in the United States whose road is operated by steam, its successors and assigns, is hereby authorized to carry upon and

over its road, boats, bridges, and ferries, all passengers, troops, government supplies, mails, freight, and property, on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states so as to form continuous lines for transportation of the same to the place of destination. But this section shall not affect any stipulation between the government of the United States and any railroad company for transportation or fares without compensation, nor impair or change the conditions imposed by the terms of any act granting lands to any such company to aid in the construction of its road, nor shall it be construed to authorize any railroad company to build any new road or connection with any other road without authority from the state in which such railroad or connection may be proposed. And congress may at any time alter, amend, or repeal this section."

In construing, in connection with this act, "An act to authorize the construction of certain bridges, and establish them as post-roads" (14 U. S. St. at Large 66), Mr. Justice *Field* says,—"These acts were passed under the power vested in congress to regulate commerce among the several states, and were designed to remove trammels upon transportation between different states which had previously existed, and to prevent the creation of such trammels in future, and to facilitate railway transportation by authorizing the construction of bridges over the navigable waters of the Mississippi. They were intended to reach trammels interposed by state enactments or by existing laws of congress. * * The power to regulate commerce among the several states was vested in congress, in order to secure equality and freedom in commercial intercourse against discriminating state legislation. The act of congress was intended to facilitate commercial intercourse among the states, and it is of great public interest that such intercourse should be free and untrammelled." *Railroad Co.* v. *Richmond*, 19 Wall. 584, 589, 590.

The peculiar, definite, and distinct language of the limitation clause relates (so far as is pertinent to this discussion) solely to the building of a new or connecting railroad. The definite expression of this limitation, by force of legal construction, excludes any other limitation or restraint upon traffic or contracts concerning traffic, and no other limitation than that expressed by the law of congress can be imposed by state legislation. The exception from a power marks its extent. *Gibbons* v. *Ogden*, *supra*. Any traffic arrangement for the interstate transportation of passengers and freight by means of continuous connecting lines is authorized by the act of congress and is within the scope of its intention, namely, the promotion of untrammelled commercial intercourse. And if this be so, the state laws referred to are nugatory, invalid, and of no effect, if they have any applicability, which we deny, to contracts between connecting roads, like the contract under consideration.

VOL. LXI.   15

Railroads in New Hampshire are public corporations "like other highways." G. L., c. 160, s. 1. They are constructed and intended solely for purposes of traffic. They are common carriers. Steamship, steamboat, and railway companies, when incorporated and engaged in accomplishing the purposes for which they are created, are commercial corporations    Green's Brice's *Ultra Vires* (2d ed.) 18. Such corporations transact immense amounts of business. and may, perhaps, in view of that fact, be well enough called business corporations, but their true legal and constitutional denomination is that of commercial corporations, as they are created for the purpose of transporting passengers and freight, which is a commercial business, involving intercourse and an interchange of commodities. Commerce among the states, like foreign commerce, is subject to the regulation of congress, and, as we have seen, it is well settled law that the word "commerce" includes navigation and transportation as well as traffic, and that the power to regulate extends to the vehicles of intercourse, by land or water, as well as the commodities to be carried and exchanged. Congressional regulation may not comprehend that commerce which is completely internal, and which does not extend to or affect other states; but the Concord Railroad is part of a connecting line, intended to promote commercial intercourse among several states. This corporation, with its engines and cars, is certainly a vehicle of commerce among the states, and as such is a commercial corporation within the meaning of the Bankrupt Act (U. S. Rev. St., s. 5122), and its transactions and contracts, so far as they relate to interstate transportation, are proper objects of regulation by congress, under the grant of power to regulate commerce among the states. Pomeroy Const. Law 244. An incorporated bridge company, where it appeared that the bridge was a connecting link between two railroads, was held by the supreme court of the United States to be a commercial corporation. *Gilman* v. *Philadelphia*, 3 Wall. 729. Comprehensive as the phrase "among the states" is, it may nevertheless be properly restricted to commerce which concerns more states than one; but when railroads incorporated in different states are connected in one continuous line of communication, they are instruments of commerce within the meaning of the constitution, and as such are commercial corporations, and are subject to exclusive congressional regulation.

Reported cases, to some of which reference has been made, confirm this construction, and show that the transportation of passengers and freight from one state to another, or through more than one state, whether by land or water, by boat, ship, or railway carriage, is commerce within the meaning of the constitutional provision referred to. And the express power given to congress is comprehensive, complete in itself, and may be exercised to its utmost extent without any limitations other than such as are prescribed by the constitution. "Confessedly railroad corporations

are created to transport passengers and freight, and it is that precise business in which they are employed.   They must therefore be held to be commercial corporations."   *Sweatt* v. *B. H. & E. R. R.*, 3 Cliff. 339, 346, 347, 348, 350, 351.   The only regulation or restriction by congress of the powers of a railroad company "whose road forms any part of a line of road over which cattle, sheep, swine, or other animals are conveyed from one state to another," except the limitation contained in the act of congress before cited, is one relating to the proper care of cattle transported in the cars. U. S. Rev. St., ss. 4386, 4387.

State regulation of foreign or interstate commerce is an encroachment upon the power of congress over the subject, and is therefore void, even though congress may never have legislated upon the subject.   *Welton* v. *Missouri, supra.*   By refraining from action, congress in effect adopts as its own regulations those which the common law, or the civil law where that prevails, has provided for the government of such business, and those which the states, in the regulation of their domestic concerns, have established affecting commerce, but not regulating it within the meaning of the constitution.   In fact, congressional legislation is only necessary to cure defects in existing laws, as they are discovered, and to adapt such laws to new developments of trade.   *Hall* v. *De Cuir*, 95 U. S. 485, 490.   Inaction by congress is equivalent to a declaration that the commerce under its control shall remain free and untrammelled. *Welton* v. *Missouri, supra ; Railroad* v. *Huzen, supra ; County of Mobile* v. *Kimball,* 102 U. S. 691, 697 ; *Webber* v. *Virginia, supra.* In the cases above mentioned, the state legislation invaded a domain which is appropriated exclusively to the national power.   Cooley Const. Law 73.   Concerning the concurrent jurisdiction of the several states, an example of state regulation, on a subject which may at the discretion of congress be brought within its exclusive control, is to be found in state pilot laws and harbor regulations. These have been recognized and their validity sustained.   *Cooley* v. *Port Wardens, supra ; The James Gray* v. *The John Fraser*, 21 How. 184.   The states may also pass quarantine laws for their own protection against the introduction of disease from other states or foreign countries.   *License Cases*, 5 How. 504, 632 ; *Conway* v. *Taylor*, 1 Black 603.

The power that controls the foreign and interstate commerce of the country must have the authority to take this subject under its control as a part of its commercial regulations.   Cooley Const. Lim. 74.   And this it has done.   By the act of 1866, and the reënactment thereof in the Revised Statutes, congress has legislated in such manner as to exclude the authority of any state legislation which shall tend to restrict the capabilities of lawful interstate traffic through the provisions of lawful contracts between connecting railroads.   By lawful contracts, I mean contracts not unlawful on general principles,—contracts lawful without reference

to the prohibition of unconstitutional state laws. The legislation of congress has been interpreted to mean that all restrictions upon free commercial intercourse between the states by such means and under such regulations as shall best promote the interests of the parties immediately concerned and of the public, and all state legislation which operates directly upon the commerce among the states, either by way of tax upon its business, license upon its pursuit in particular channels only, or conditions for carrying it on, are void. *Sherlock* v. *Alling*, 93 U. S. 99, 102. If the constitutional view here suggested is approved by the court, the main questions presented by the bill will be disposed of; because, if congress alone has exclusive control of interstate commerce, the limitations claimed to be imposed by our state laws are of no effect, and these corporations may lawfully contract for the management and control of the business in which they are both interested, by any arrangement, not fraudulent, which shall be considered by the contracting parties best calculated to promote their interests and the public good.

In any consideration of the case, and notwithstanding the presumption of law in favor of the legality of the contract, the defendants should not be deprived of the opportunity of showing its real purpose, practical operation, and effect, which can only be made clearly and fully apparent by the evidence which the plaintiffs seek to exclude. When that evidence shall be presented, it will be demonstrated that the contract is intended, and its effect will be to promote not only the mutual interests of the parties but of the public, both as to the mode of transaction and the tariff of the joint business, as well as in all other matters relating thereto, by enabling the management under the contract to conduct the business " with greater facility and regularity, and at a greater saving of expense to both parties, through a more efficient and more economical joint operation," affording " better security of their respective investments, as well as the convenience and interest of the public." Whatever state legislation, in conflict with these purposes and results, tends to prevent, obstruct, or embarrass the regularity, facility, efficiency, convenience, or economy of interstate railway transportation and traffic, or to prevent or impair the making of fair and honest contracts relating thereto, is unconstitutional and void, as well as contrary to true public policy.

We contend, therefore,—1. The contract is *infra vires* of the contracting parties. 2. It is not prohibited by the statutes of the state. 3. It is expressly authorized by the statutes of the state. 4. Any attempt at state legislative prohibition of such contracts is in conflict with the constitution and laws of the United States, repugnant thereto, and of no effect.

Oral argument of *J. H. George*, for the defendants. This is, as has been suggested, an application by the plaintiffs for a tempo-

rary injunction to be heard before this court upon the contract which it is admitted has been executed and is in operation, and upon the laws of the state of New Hampshire and of the United States, and upon the charter of the road. My brethren take two grounds: First, that this contract is in plain violation of the laws of New Hampshire; and, second, that it is *ultra vires*. My position is, that not only is it not in conflict with any law of the state, but that it is in accordance with and justified by the laws of New Hampshire, and that no law exists to-day, or ever has existed, to prohibit a beneficial contract of this character. And I also hold, and am able to show, that instead of being *ultra vires*, beyond the powers of the corporation, it is *infra vires*, and within its power. I desire, in discussing this first branch of the subject, before I come to the other question, as to what are the incidental powers of a corporation, to ask your honors' attention to the laws as they were passed, to the times when they were passed, to the circumstances under which they were passed, and to the acts which for the last thirty years have been done under these laws. I shall be pardoned, I trust, for giving briefly a short historical review of the beginning and growth of railroad interests in the state, and of the laws which were passed from time to time to regulate and control these interests; because, in the interpretation of these statutes, as it seems to me, the court should give especial attention to the circumstances under which they were enacted.

The first statute that was passed regulating contracts made by railroad corporations, as I believe, will be found in the Revised Statutes, 1842, *c.* 142, *s.* 10. It was originally passed in 1841, and gave power to railroad corporations to contract with other railroad corporations for the transportation of freight and passengers, and the conducting of all business connected therewith. So far as I am able to discover, there was no change from the law of 1842 giving this plenary and absolute power to railroad corporations to contract as they chose in regard to business done over their railroads, until the year 1850; and I will call the attention of the court to the statute then passed, after I have stated the facts with reference to the extension of railroads before and between those times.

The first railroad that extended into the state was the Nashua & Lowell Railroad, which was built to Nashua, I think, in the year 1838. Therefore, this statute of 1842 simply applied to that railroad as an existing corporation; for the Concord Railroad, which was the next railroad extending into New Hampshire having any connection whatever with any other railroad in the state, was opened to Concord in September, 1842. Hence this general statute of 1842 was undoubtedly intended to apply to the Concord Railroad, which was then about to be opened, and to the Nashua & Lowell Railroad, three or four miles of which in this state had been opened some three years before. In 1847, 1848, 1849, and 1850 a

very large number of railroads were constructed within this state,—the Northern Railroad, the Claremont Railroad, the Montreal Railroad, the Cheshire Railroad, the Boston & Maine Railroad, and others. Prior to that time, the Eastern Railroad in New Hampshire had been commenced, and I am not certain whether it had been extended to Portsmouth prior to 1842. The railroads within the state had been largely constructed prior to 1850.

The law entitled An act in relation to railroad corporations, Laws 1850, c. 353, s. 8, provides that " no contract between two or more railroad corporations for the use of their roads shall be legal or binding, unless such contract shall be sanctioned in writing by the railroad commissioners, and approved by the governor and council." I beg your honors' attention to the peculiar wording of the statute, because I think I shall be able to show exactly to what class of contracts this statute refers. The law of 1850 was intended to apply to just two cases. It embraced the lease of one road to another, because a lease is a contract for the use of one road by another ; and it embraced contracts common in those days, by which one road used in common, for its own purposes, the road of another. Those were the two classes of contracts, and the only two classes, covered by the term " contracts for the use of a road," namely, leases and contracts by which one road used another road for its own purposes,—precisely as though the Northern Railroad, by virtue of a contract, should run its train through to Manchester, or through to Nashua, over the Concord Railroad, for a specified sum, and under its own control. Prior to that statute there were a large number of cases where one road had taken a lease of another. And there were a smaller number of cases, but still quite a number, where one road had obtained the right to a common use of another. And the instances were numerous in which that class of contracts were executed. The legislature said we will not make legal and binding a contract which shall pass any road out of its own control into the control of another road, so far as the running of trains upon that road is concerned, without the sanction of the governor and council and the railroad commissioners, because that is dangerous, and because that is parting with the franchise. To show I am right as to the interpretation of this statute, and the intention of the legislature, I ask your honors' attention to the statute that was passed the next year. While the above law remained on the statute book precisely as I have read it, the next year, 1851, there was passed another statute (Comp. Sts. 352), which is as follows : " In all cases where railroads are unable to agree upon terms of connection, or on referees to whom the same be submitted, either road, in such case, may apply to the superior court, or any two justices thereof, who are disinterested, in vacation, for the appointment of an impartial and disinterested board of referees. And the superior court of said justices, on due notice to the opposite party, shall appoint such

board of referees to adjust and determine all matters of connection between said roads, whose report shall be final and conclusive between the parties, for such term as said referees may award, not exceeding one year, or such further time as the parties may agree upon."

If the interpretation which my brethren put upon the statute of 1850 is correct,—if a contract providing that the cars, and the brakemen, and the switchmen, and the baggagemen, being furnished by one road, may run over another road, as must be the case under any arrangement for connection,—if such a contract is embraced within the statute of 1850, and is a contract for the use of one road by another within the meaning thereof, then the statute of 1851, which provided that if the parties disagree upon the terms of connection, or on referees, either party may apply to the court, and referees should be appointed, and they should make the award, and the award should stand for one year, and as much longer as the parties wanted, it was a repeal of that statute, was it not?  The parties certainly had a right to agree, for the law provides what may be done if they disagree.  The statute did not say that the award was to be subject to the approval of the governor and council and railroad commissioners.  It was to continue so long as the parties should agree that it was a fair and judicious contract fixing the terms of connection.

Subsequently, in 1855, I think, the legislature took out of the statute of 1850 the right to lease with the approval of the governor and council and the railroad commissioners, and said that no lease should be made of one road to another without the authority of the legislature.  The statute giving the right of connection, and the statute providing that no contract by one road for the use of another road should be valid for more than five years, nor without the sanction of the railroad commissioners and the governor and council, were left on the statute book, but they abstracted from the latter the power which existed before, of making a lease for five years with the approval suggested, and left it so that no contract of lease should be binding or valid without the assent of the legislature.  This explains, and explains perfectly, the apparent discrepancy and collision between these two statutes.  The original statute covered the lease; and the original statute covered the right to use in common a railroad.  It did not refer to contracts between roads governing the terms of connection; it had no relation to a contract between the Northern Railroad and the Concord Railroad, for example, by which the Northern might send passengers over the Concord, accompanied by its own brakemen, baggagemen, and conductors, if need be, for the purpose of doing a connecting business: but it simply left that to be governed by the statute providing that the railroads might make terms of connection for their connecting business, as they could agree, and failing to agree, the court, upon petition of either party, might appoint a board of

referees, whose decision should be final for a year, and for such further time as the parties might agree. I have attended many hearings under this statute; and referees have been appointed under it, and courts have awarded judgment upon the award of such referees over and over again. There have been many controversies between the Montreal Railroad and the Concord Railroad, and between various other connecting railroads of this character, and now is the first time it has ever been suggested that such a contract required the sanction of the governor and council and the railroad commissioners. I make this suggestion to the court for two reasons: I hold that there is such a thing as honest, fair, and straightforward dealing with the public; I hold that a man has no right, when a contract is.made involving public interests, to turn around and denounce it as fraudulent, and a plain and palpable violation of the law, and accuse men of acting not only contrary to their convictions and contrary to the plain principles of common honesty, but contrary to the plain statute of the state, and then, when he has incorporated those charges in a bill in equity, come here, and, refusing all investigation and furnishing no proof, simply say, "There is a presumption of the defendant's innocence."

There have been probably a thousand contracts entered into between the upper roads and the lower roads, determining the rates and the manner in which the business should be done, fixing at what rate one road should draw the cars of another, at what rate and in what way one road should be paid for the use of the cars of another, how brakemen and other trainmen should be paid, who should bear the risks, and determining all the questions involved in railroad connections, and not one of these contracts has ever been submitted to the governor and council for approval; and heretofore there has never been from any quarter, so far as I know, a suggestion that a contract of that character required such approval.

One would suppose from what has been said, that this contract is one of the most extraordinary character ever known in the annals of infamy, one that is to deprive the people of their public rights and the stockholders of their private rights; and yet every man of common intelligence familiar with the general subject knows that from 1857 to 1879, a contract, of which this is a substantial and almost verbatim copy, existed between the Nashua & Lowell Railroad and the Boston & Lowell Railroad, and was in operation during all these years, without the suggestion of legal objection from any quarter; and my brother can hardly say that no party had an interest in investigating and opposing that contract. The question of the right of the Concord Railroad to make an arrangement with the Lawrence Railroad was before the community and before the court; and yet that arrangement, to a very marked extent, was influenced and determined, necessarily determined, practically by the contract existing between the Boston & Lowell

Railroad and the Nashua & Lowell Railroad, to which I have referred; and during all that controversy we had these able gentlemen here, but they did not regard that contract as an embodiment of infamy, and in opposition to the laws of the state.

Thinking this contract to be wise and legal, thinking it a contract beneficial to the state, thinking it to be a contract which not entered into would be destructive to the best interests of the state, I advised it. Nowhere do the laws of New Hampshire prevent the making of a contract regulating the terms of connection between railroads. Our laws specially provide that railroads may make such contracts. Any man who has had any practical experience in the operation of railroads knows that you cannot run a connecting railroad without such contracts. You can neither have a line of railroad from Franklin to Nashua, or from there to Boston, or do business thereon, without connections, and you cannot have connections without contracts. For illustration: How long would the community permit connecting railroads to dump their freight and passengers at the termination of each? How long would they submit to the nuisance of it? How long would they submit to the expense of it? How long would they submit to the delay of it? And yet, according to my brother's idea of the powers of a railroad under its charter, it has no right as an incident to its powers, because it is not expressly granted, to send its cars over another road, or permit the cars of another road to run over its road. My brother has devoted several pages of his brief to showing, what I thought was elementary, that a railroad has no powers except such as are expressly granted, or are reasonably necessary to the grant. The powers expressly granted are very easy to be determined. But what are the incidental powers of a railroad is an entirely different question. If you look at the charter of the Boston & Lowell Railroad of 1830, the first railroad charter granted in New England, you will find that, under the strict letter of that charter, it has not any right to run a railroad at all. It has the right to build and complete a railroad, but nowhere in that charter, from beginning to end, does it give the right to run cars over the road, or to operate the road. Why not? Because at the time the charter of the Boston & Lowell Railroad was granted, the idea was that the road would be operated precisely like a turnpike; and the charter gives, with great minuteness of detail, the right to fix upon the weight of loads, the style of carriages, and the strength of the wheels, to erect toll-gates, to collect tolls; and nowhere in the letter of the charter is there given the right to run and operate the railroad as it is to-day. The whole theory was, that the railroad would be used by parties who would furnish their own motive power and their own cars; while the directors would have the right to supervise the weight of loads, the character of the motive power, the strength of wheels, etc.

When the road was chartered, it was entirely uncertain whether

it could be operated by steam power; and the report of the commissioner, who was appointed by the legislature to consider, investigate, and report upon the practical construction of a road from Boston to Lowell, reported that while he had not any reasonable doubt that a railroad could be built from Boston to Lowell, the question whether or not it could be operated by steam power was another and entirely different question; that if the experiments then in progress in Great Britain should show it could be operated by steam power, then he should recommend such and such constructions; if, on the other hand, those experiments should prove a failure, resort would have to be made to animal power; and he made the suggestion that if it should be operated by steam power, he should recommend the construction of two parallel tracks, without turn-outs; whereas, if it should be operated by animal power, he would recommend a single track, with turn-outs equally distant. I mention this to show how this matter has grown. It shows that the things contemplated at the time of the charter of this road did not reach one hundredth part of the capacity which they were inevitably granting by granting the charter. Now for illustration: At the time the Boston & Lowell Railroad was chartered, in 1830, statistics were introduced before the legislature showing that the total number of passengers between Boston and Lowell by private conveyances and stages was from thirty thousand to thirty-seven thousand per year. Last year, the Boston & Lowell Railroad, with the Fitchburg Railroad on one side and the Boston & Maine Railroad on the other, each accommodating a large portion of the business originally contemplated to be done by the Boston & Lowell Railroad, carried more than three millions of people. In the statistics at that time. they assumed that the manufacturing corporations of Lowell furnished sixteen tons of freight per day, and they thought that eight tons per day would cover the freight from outside parties, making twenty-four tons per day, or seven thousand four hundred tons per year. Last year the Boston & Lowell Railroad carried a million tons over its rails. They supposed. when they chartered the Boston & Lowell Railroad, it was to do this small amount of business. Yet there was one thing that was quite remarkable, that this commissioner, who reported that it was doubtful whether it could be operated by steam power, and that it might have to be operated by animal power, put in the report, which I have here before me, the wise suggestion and the pregnant one, that a line of railroad from Boston to Lowell would ultimately be part and parcel of a line extending up through New Hampshire into Vermont, and to the Canadas, and that it should be constructed with a view to such a result. Mr. Heywood, thirty years ago, saw that a railroad situated like that road must, for the accommodation of the people and of the country, be extended as a connecting line through New Hampshire and into Vermont—I believe he stopped at Canada; and yet we have men to-day who

are worried because an arrangement is made between railroads seventy-five miles long, by which a very large portion of the running expenses may be saved, and by which twice the accommodation can be afforded, and at cheaper rates to the community; we have men earnest to take the community under their control, and protect its rights against an operation of that character. They come here and ask the court for an injunction without an investigation; and the defendants come in and say, "We ask no delay; we will accept service of notice; we will take our testimony at once; we will lay before the court all the facts pertaining to this case, and at the next term the court can pass upon the case intelligently." They object to the offer, and oppose any suggestion which will enable the court to see the bearing of the law on the facts, and the bearing of the facts on the law, and then instruct their counsel to come here and say that every one is presumed to be innocent until proved guilty. When the defendants ask to be investigated, they say that creates a suspicion of fraud, for no one wants to be investigated but he who has done wrong!

What is absolutely essential to railroad connection? Let me again repeat that the express powers granted in the charter are easily determined. Their incidental powers depend upon the facts of the case. The charter of the Boston & Lowell Railroad does not give the Boston & Lowell Railroad a right to run the road at all. Supposing the theory under which the Boston & Lowell Railroad was chartered had proved to be true,—that it could only be operated by horse power; that the people who use it would have to put on their own horses and carriages, precisely as they run canal boats, or use turnpikes: and supposing the Boston & Lowell Railroad had built a lot of locomotives, and a bill in equity had been filed, complaining that the Boston & Lowell Railroad, instead of confining itself to the ownership of the iron rail turnpike, and keeping it in repair, was building expensive machines: there is no court in the world but on the showing of those facts unexplained would grant an injunction against the Boston & Lowell Railroad for diverting its funds to build locomotives, because those locomotives had no connection with the operation of the road. But if a bill in equity should be filed, setting forth that it was a charter for an iron turnpike, and that they were thus expending their money, and it appeared that the use of locomotives was essential to the running of the road, the court would be of the opinion that the building of locomotives was an incident to the powers of the corporation under their charter.

Supposing some stockholder in the Boston & Lowell Railroad should file a bill in equity, setting forth that it was diverting its funds for the purpose of erecting a line of telegraph, saying, "We ask an injunction. Here is a contract showing that they have contracted to build a line of telegraph, and there is their charter, which does not mention anything about building a line of telegraph.

A railroad is one thing, and a telegraph is another thing. We don't want evidence introduced here at all." The railroad answers,— " We propose to show that the erection of a line of telegraph on the line of the road is essential to the safe operation of the road. We propose to run our road by telegraph. We propose to show that all the first-class roads in the country run by telegraph, and that a road cannot be run safely in any other way." Is there no occasion for showing the facts as bearing on the question whether the matter is *ultra vires,* or *infra vires ?*

We assume that it is the right of railroads to make "terms of connection." What do "terms of connection" mean ? We think that roads may make business contracts by which passengers and freight may be forwarded from one road over another road in such a way and upon such terms as shall afford the public proper accommodation, and shall be fair and honest between the roads. For illustration, let us take the Concord Railroad and the Northern Railroad. Probably ninety per cent. of all the freight and travel that goes over the Northern Railroad is connecting business with the Concord Railroad ; probably ninety per cent. runs down past the junction of the two roads. The travel of the Northern Railroad must either change cars at Concord, and change cars at Nashua if it goes beyond, and change cars at Lowell if it goes beyond there, or else the Northern Railroad must make some contract with all the roads below for the running of its cars through to Boston. It may be said,—" Very well, let the Northern Railroad run its cars down through, and let the Lowell Railroad run its cars up through." In the first place that involves a contract ; but in the second place an arrangement of that kind involves the necessity of both sets of cars going empty one way. and it takes just twice as many cars to do the business as it would if the arrangement were that one road should furnish all the cars for the through business. If we have an opportunity, we will show the exact manner in which these connecting contracts have been made for the last forty years.

At an early day, when the Northern Railroad was built, it made arrangements, for instance, that the Northern Railroad should charge from Franklin to Boston the combined local fares, that is, the fare from Concord to Boston, and the fare from Franklin to Concord ; that it should furnish cars for the passengers ; and that the lower roads would allow to the Northern Railroad half a cent per mile for each passenger in its cars ; and the Northern Railroad under that contract was required to take all risks ;—that is, if the passenger met with any injury between Concord and Boston under this contract, which was one of the earliest of these contracts, the Northern Railroad, for the thirty-seven and a half cents that it got for furnishing cars from Concord to Boston for its passengers, stood in for the damages; and it furnished brakemen to run through on its cars, and accounted to the lower roads for their local fares.

Now, suppose my brethren should say that the Concord Railroad had a "toll granted them by its charter for the sole benefit of the corporation," and therefore the contract between the Northern Railroad and the Concord Railroad, by which half a cent per mile should be allowed the Northern Railroad for furnishing cars for connecting passengers, was *ultra vires*, would that be argument? It is impossible that there should be a connecting contract without embodying arrangements of that character. Do your honors ask what occasion there was for requiring the Northern Railroad to take the risk of its passengers in the case supposed? Supposing that when the passenger got to Nashua there was ice on the step, or the platform was out of order, and the man should break his leg: what occasion was there for the Northern Railroad to take that risk? I grant that incidental powers must be reasonable powers; but whether they are reasonable or not depends on the circumstances of the case. Let us see why that contract was proper. Here is a train from the Northern Railroad; it gets on the Concord Railroad, and the brakeman who accompanies it is the brakeman of the Northern Railroad;—suppose he brings up these cars too suddenly, and thereby causes an accident: the accident is occasioned by the servant of the Northern Railroad;—supposing the accident occurs from the car trucks not being in repair; then, also, the accident was occasioned by the negligence of the Northern Railroad. Supposing the brakeman does his duty, supposing the car is all right, and supposing the track is out of order, and there is a smash-up: then the accident is due to the Concord Railroad;—supposing the accident happens through the carelessness of the engineer: then the Concord Railroad is considered in fault. But the great trouble is, the cause of the accident is generally hidden, and no power on earth can tell its origin, whether it was the carelessness of the brakeman, defect in the car, defect in the track, or the fault of the engineer; whether a defective wheel breaks the track, or a defective track breaks the wheel; and in order to save all controversy, and because there is no other way to arrive at it, the custom has been for the upper and lower roads to allow a certain sum of money or certain rights to other roads for assuming the risk of injury to their passengers from whatever cause the passengers are injured.

Then take freight: The freight of the Northern Railroad comes down to Concord. Is there a man who says that freight ought to be changed at the junction? He could put people to a great deal of inconvenience; he could make great and unnecessary expense and delay; and then he would not avoid the difficulty which is suggested as the reason why this contract is *ultra vires*,—because you cannot transfer freight from one road to another road without having facilities for transfer, which would have to be furnished by one road, or by the other road, or by both roads; and those facilities would have to be the subject-matter of contract. A contract that

would be perfectly *infra vires* so far as the Northern Railroad and the Concord Railroad are concerned, and so far as the Concord Railroad and the Boston & Lowell and Nashua & Lowell railroads are concerned, would be *ultra vires* so far as the Northern Railroad and the Rutland Railroad are concerned, which have no business connections. The rights of corporations, from the necessities of the case, depend upon circumstances. I do not claim that a contract of this kind made between the Concord Railroad and the Cheshire Railroad, or between two roads having no business connection, would be valid. The right to make this contract grows out of the necessities and situation of these roads as they are recognized by the statutes of New Hampshire, recognized by the people after forty years of experience, recognized because it is the only way in which business can be done, having regard either to convenience, safety, or economy. Do my brethren claim that the existing contracts between the Montreal Railroad and the Northern Railroad, and the various roads on through to Boston, are *ultra vires?* Do they claim that because no one of these contracts has been submitted to the governor and council and the railroad commissioners for their approval, they are null and void and without effect? But those contracts, every one of them, and every other connecting contract in New Hampshire, cover in principle everything embraced in this contract between the Boston & Lowell and Concord Railroad corporations. They run their cars through ; one train comes down on the Montreal Railroad for Boston ; there are say ten passengers at the Concord station ; they get into the same cars which came down the Montreal road, and they are carried to Manchester, or they are carried to Nashua; and an arrangement is made between the roads by which the upper road accommodates in its cars the business of the lower road, in order to save expense, in order to save time, and in order to accommodate the public. And yet, if that contract is *ultra vires*, when a passenger comes down the Montreal road the train in which he comes is to be set one side, and not a single passenger is to get into that train, because an arrangement that these through cars might be used for the common purposes of both local and through roads is *ultra vires* under the charter of the Concord Railroad and the laws of New Hampshire.

We will not only show, if we have an opportunity to show it, what the uniform practice for forty years has been, both on this road and on every line where there are connecting roads, but we will show that business cannot be done in any other way, having regard either to economy or efficiency ; and we will show that contracts covering the same principle have existed between all railroad corporations in the state that are part and parcel of the same line. Let us go further. We will show to this court, if we have an opportunity to show it, that of the Concord Railroad business ninety-three per cent. of the tonnage is through freight, and

seven per cent. of the tonnage is local freight, that is, starts at some point on the Concord Railroad and ends at some point on the same road.   Ninety-three per cent. is through connecting business ; and that is a very material thing, as bearing upon the propriety of this contract, because any arrangement that is made for the connecting business must of necessity be an arrangement for the local business, because the local business is a very small incident to the connecting business.

The local business is so small an incident to the connecting business of the Concord Railroad that it is absolutely impossible for any man, however expert he may be, to separate the expenses of doing one kind of business from the expenses of doing the other kind : the thing cannot be done.   Take a very simple illustration. To-night there will be brought down over the Montreal Railroad, and over the Northern Railroad from the city of Montreal, two trains of cars through Concord to Boston ; they will unite here at Concord.   These cars belong either to the Montreal Railroad on the one hand, or to the Central Vermont and Northern railroads on the other hand : in all, four cars.   Ten men get into those cars at Concord, and ride to Manchester or Nashua ; that is local business.   What is the expense to the railroad of carrying the ten men in those cars?   There are two hundred through passengers : ten passengers get in here to go to Manchester or Nashua.   You are called upon to divide the expense of carrying these two classes of passengers.   Where is the man that can do it?   Do any of these gentlemen claim to do it by some ingenious way of figuring?   No honest and intelligent man will assert that it is possible to do it. So it runs all through the business of these connecting roads.   You might take from the Concord Railroad every dollar of its income from its purely local business, and it would not be impoverished : to-day it is saving under this arrangement more than double what its entire local business amounts to   Nothing in the world but the prosperity of the Concord Railroad, having such a large amount of business that it could afford every species of extravagance, has tolerated the condition of things which has existed for the last thirty years in the operations of the roads between here and Boston. Look at it — seventy-five miles of track from here to Boston ;— take an engine from an engine-house at Boston that cost $14,000 ; put on that engine an engineer with three or four dollars a day salary, and a fireman with a dollar or two salary.   It takes two hours for that engine to heat up ready to start ; you attach the engine to the train, and before you have got it fairly under way you have reached Lowell, twenty-six miles ; you set it out on a sidetrack, because it would be *ultra vires* to run it any further, and your engineer and fireman, with an aggregate salary of six dollars a day, sit watching it cool off.   Then you put on another engine costing $14,000, which you commence to heat up an hour before the first engine started from Boston, and you put on another

engineer and another fireman, and go fifteen miles farther; and you set that off on a side-track because it would be *ultra vires* to run it any further. You hitch on a third engine, which you began to heat up before the first engine left Boston, and put on another engineer and fireman, and run another thirty-five miles up to Concord. You use $42,000 worth of engines, and you use three engineers and three firemen to get a passenger train seventy-five miles when two hundred miles is a moderate day's work for a locomotive, because it is *ultra vires:* it is a great fraud to make an arrangement by which an engine shall be run through as well as the cars! There would be some little sense in changing a passenger car when you get to Lowell, because the cost of that is only three or four thousand dollars, and you would need no one to watch it; but your engine cost $14,000, and you have to have somebody watch it while it cools off. The connecting business between the Boston & Lowell and the Concord railroads is the great mass of business of the Concord Railroad; and we have the right to make arrangements for that connecting business so that it can be done honestly, faithfully, and for the best interests of the public. It is absolutely impossible from the nature of things to show what the expense is of doing the local business in connection with other business, so as to arrive at any other than purely arbitrary results. Your cars, so far as the connecting business is concerned, must necessarily be used in common if you do a connecting business under any sort of contract.

We are prepared to show that the directors of these two roads took the business of the roads, and ascertained what the result had been for years. They showed what the increase had been on the one road and on the other; and instead of saying, we will allow you for your cars an arbitrary sum, so much; for taking the risk we will allow you an arbitrary sum, so much; and for brakemen and baggagemen we will allow you an arbitrary sum, so much,— they said, we will arrange this connecting business upon a basis which is the result of a careful and fair investigation of what each road has earned, and what it can earn; and we will appoint a manager, who shall be a common manager, the Concord Railroad retaining its rights and the Boston & Lowell Railroad retaining its rights, and we will divide just as we have before under separate management, giving to the public and the roads the savings which can thereby be made. If that was not a contract which would commend itself to every honest and fair-minded business man, looking at the interests of all parties, then I am grossly deceived.

You may take up the rails between the Northern and Montreal and Concord railroads, and require the transshipment of every ton of freight and the transfer of every passenger here at the Concord depot, and you would not check in the least degree the travel from points beyond the state of New Hampshire to Boston. It would be like stopping one of four streams of water: you stop up this

stream, and the freight and travel take one of the other routes around the state. This route through Concord is an important route to New Hampshire; but you can wipe it out of existence to-day, and every ton of freight and every passenger from beyond our limits would reach Boston just as efficiently, and just as well, and at just the same price, by some other route. And the practical question that is presented to-day is, whether or not the public shall have this route as cheap, as efficient, as accommodating. and as perfect as any other route, or whether they shall have it a route at all,—whether they shall have the business turned around the state instead of having the business go through the state.

Do my friends say, although we may make arrangements for through business, we have not any right to make arrangements for local business in the same connection? The Concord Railroad and the Northern Railroad probably make the same arrangement that is made between terminal roads everywhere;—that is, the Concord Railroad owns the depot at Concord, and the Northern Railroad runs into that depot; they have a common ticket-master there; he sells tickets in the Concord Railroad office for the Northern Railroad, and the Concord Railroad has no interest in those tickets. One man goes to that ticket-office and buys of the Concord Railroad ticket-master a ticket to Claremont, but he does not touch the Concord Railroad after he gets out of the depot. Another goes to the same ticket-master, and buys a ticket to Franklin. I am not aware that the Concord Railroad has any interest in that ticket; in other words, the Claremont and the Northern railroads not only make an arrangement by which the Concord Railroad furnishes a depot for connecting business between the Concord Railroad and the Northern Railroad, but make an arrangement for the accommodation of the entire business of the Northern and Claremont railroads, originating and terminating at Concord.

The same is true in regard to the local freight of the Northern Railroad, which goes into the hands of the freight-master of the Concord Railroad under a contract; and why? Because it can be done cheaper and better in that way than in any other;—and yet I suppose my brother would say, "It is *ultra vires;* a toll is granted to the Concord Railroad for the sole benefit of the stockholders of the Concord Railroad; therefore these arrangements are illegal, which include in the contract between the connecting roads a provision that their agent at Concord should also be the agent of each of those roads in care of their local business, in which the Concord Railroad has no interest." If any one should undertake to run the Concord railroad with the idea that it would have nothing to do with the freight or passengers of any road except its own, we should have at Concord a passenger station for the Montreal Railroad, one for the Concord Railroad, one for the Claremont Railroad, one for the Northern Railroad, one for the Vermont Central and Grand Trunk railroads, and so on *ad infinitum.* My point is, where the

local business is the mere incident of the other business, and the expenses cannot be separated, a contract regulating connecting business is no more void because it embraces local business, than a contract involving the use of this depot for connecting business is void because the local passenger starts from the same depot by virtue of the same contract.

The counsel may say that the contract is fraudulent, that it is pretended that it is for the connecting business, while as a matter of fact the purpose is to form a partnership between the railroads. Should this be their claim, let me say, we agree with them most perfectly, that if the contract has an element of fraud, if the contract has a scintilla of unfairness, if there is any false pretence in the contract from beginning to end, if it is not what it purports to be and the evidence does not show that it is what it purports to be, namely, a business arrangement for doing the connecting business of these two roads, then I grant that it is not only *ultra vires*, but is a contract justified neither by law, fact, nor honesty ; and it is because I claim that it is exactly the reverse of what is charged, that I ask that it may be fully investigated.

There cannot be the slightest doubt in regard to congress under the constitution of the United States having precisely the same power, not only from the same instrument, but from the same sentence in that instrument, the same clause of it, to regulate interstate commerce as it does commerce between this country and a foreign nation.   My brother to-day passed a high encomium upon Chief-Justice Redfield ; and if he will look in Redfield on Railways, he will find that the author lays it down that there is no distinction between our great lines of railroads and our great navigable rivers; that the same principles apply to the one that will apply to the other ; that commerce not only includes the rivers and steamboats, but the freight and passengers which are on those rivers and steamboats, passing from one state to another;— it equally includes our great lines of railroads and the cars and travellers and freight which pass over them from one section of the country to another.   Nowhere is it suggested that any contrary view or any contrary policy can be maintained.   Supposing congress had failed to act upon the subject, then, permissively, the state could act.   But when congress has acted, the power of congress becomes exclusive, and the states are deprived of all power over the subject-matter.   I do not want to be understood that the states are deprived of police power, that the states cannot control the method in which corporations may be operated under the police power, but I am talking about the question of determining the terms of connection between railroads extending from one state to or through another state.   Although they exist in the same state, if they are a part and parcel of a connecting line extending through different states, then under the law of congress they have the right to connect, and all the rights incident to connection.

The claim is, that the right to connect means the right of physical connection, the right of material connection, the right of putting one rail against another rail. The statute says that whereas congress has the right of regulating interstate commerce under the constitution of the United States, therefore every railroad in any state on which steam is used shall have the right to transport merchandise and to do certain other things, and to connect with any other railroad on which steam is used. The statute then goes on to say that this shall not give the right to construct any new railroad. If the statute is to give the right of physical connection simply, that physical connection either exists, or it does not exist. If it does exist, the statute does not give any right at all; if it does not exist, it cannot be made to exist without building a new road, because you have got to build a new road to put the two rails together; but the statute gives no right to construct any new road. Therefore, if it is a physical connection, the statute is a mere nullity. But the statute does not mean any such thing. The statute means that any railroad upon which steam is used in one state shall have the right to connect with any similar railroad in any other state which is a part of an interstate line of communication,— that is, it shall have a right to a business connection; it shall have the right to make all contracts which are necessary and essential to carry out that connection, or else it is a farce. To say they have the right of connection if connection exists is absurd; and if it means physical connection, to say they have the right of connection, and shall not have the right to make one, is equally absurd. If a railroad constitutes part of a connecting line between different states, no one state can block it up, any more than New Jersey can impose a tax on passengers going through that state in order to derive a revenue for the state.

After the foregoing arguments, the counsel for the defendants submitted the following as their understanding of the facts:

1. The object of the contract between the Boston & Lowell Railroad and the Concord Railroad is to insure honesty, efficiency, and economy in the management of the contracting roads, and this effect is being secured by the practical operation of said contract.

2. The great mass of the business of the Concord Railroad is connecting business with the Boston & Lowell Railroad and commerce between the several states.

3. The Concord Railroad and the Boston & Lowell Railroad are operated by steam, and constitute part of a connecting line of railroads extending through several states, and have been operated and so used for connecting business and interstate commerce for many years.

4. Over said roads are now, and for many years have been, run postal cars of the United States and passenger and freight cars, by means of which mails, persons, and property are carried, without

delay or transshipment, through several states and from one state to another.

5. The Concord Railroad was opened for business in 1842, and has since been continuously operated. The local business has been so small that no regular local train, either passenger or freight, has ever been run over the road, or has been or is now required. Its local business has always been done as an incident to its connecting and interstate business, and must continue to be so done.

6. Among the necessary subject-matters of connecting contracts between railroads are,—the use of cars, the risk to passengers and freight, the employment of trainmen, the furnishing of motive power and track, the regulation of the number and character of trains, the sale of tickets, the loading and unloading of freights, the furnishing of depot accommodations and terminal facilities, the making and guaranteeing of collections, the establishment and regulation of joint fares and freights, the appointment of agents and the expense of agencies and advertising, the running of express and postal cars, in addition to a great mass of minor details dependent upon the existing circumstances of each case. The adjustment and compensation for all these services must be determined by arbitrary rates, because their cost is incapable of definite computation.

7. Prior to 1850, the time of the passage of the law limiting the right of railroads to contract with each other by lease or for common use, it was the practice of railroads to execute leases, and to hire the right to run their trains, under their own control, over another railroad.

8. Since 1850 many hundreds of contracts regulating connecting business and involving many millions of dollars have been made, modified, and annulled, between connecting railroads in this state, and between railroads in this state and connecting railroads in other states, and in no instance has any such contract or action thereon been submitted to the governor and council or board of railroad commissioners for their approval or sanction, and no suggestion has hitherto been made as to the necessity or propriety of such approval or sanction.

9. In such contracts provision has necessarily been made for the furnishing of cars and employés of one road to run through over the connecting road upon an agreed rate of compensation, providing how the risk to passengers and freight throughout the entire route shall be sustained, in what manner the rates of fare and freight shall be fixed or arranged, and generally how and upon what terms the connecting business shall be done; and such provisions, in whole or in part, are inseparable from such contracts.

10. In ordinary connecting contracts provision necessarily is made for the arbitrary adjustment of each of these matters separately, and in the present contract the same result is reached by an aggregate settlement of all these matters, based upon a fair percentage ascertained by past experience.

11. Upon connecting trains it is impossible to prevent a portion of the local business being done between the principal stations on the road ; and where, as must be done in the case of these contracting parties, the local, connecting, and interstate business is done upon the same trains, any even approximate separation of the expenses of the local from those of the connecting business is impossible. In such cases the determination of such expenses is merely arbitrary, and dependent upon extraneous circumstances. Any contract regulating the connecting business, where local business is incident, must directly or indirectly embrace the local business.

12. In all contracts regulating connecting business, which embrace the common use of cars and the common employment of trainmen and other employés, the contracting roads have of necessity a joint interest in the subject-matter of such contracts, and in the proceeds derived therefrom.

13. From the first inception of connecting contracts, the Boston & Lowell Railroad, as the principal terminal road, has, as a business necessity and by contract, made and guaranteed the bulk of the collections due to the Concord and other upper and connecting roads, and has made monthly settlements with said roads therefor.

14. Both these contracting parties have for years employed a cashier chargeable with the duty of collecting from the ticket-sellers, freight agents, and various other receivers of corporate funds, and of paying the properly approved bills of the corporations, making monthly settlements with the treasurers for the sums so received and paid. This is the usual and judicious course pursued by large railroad corporations ; and the cashier appointed under this contract performs for each of these corporations precisely the same duties heretofore performed by the cashier of each, and gives bonds for the faithful performance thereof.

15. The division of the common earnings under this contract is based upon and determined by the earning capacity, past experience, and existing circumstances of the two corporations. Under it each of said corporations receives its just share of said common earnings, and of the benefits resulting from the saving of expenses, and from the connecting use of the rolling stock and other property. Under this contract the Concord Railroad is entitled to and does receive a larger sum in net earnings than it would receive upon the same business under preceding contracts, and the public receive the benefit of cheaper rates and a more convenient and more efficient management. Under it the rights of the stockholders of the Concord Railroad are more fully protected and the rights of the public better subserved than they have ever been under any preceding contract, or can be under any arrangement which does not substantially embody its provisions.

16. The present contract is practically identical with that under which the Boston & Lowell and Nashua & Lowell railroad cor-

porations were operated from 1857 to 1879,—the legality and expediency of which were not questioned,—said corporations being connecting railroads, forming part of the same line with the roads which are parties to the present contract.

*Bingham & Mitchell*, for the plaintiffs. The sixteen propositions presented by the defendants do not state a defence in law, and evidence in support of them is, upon the motion for an injunction, immaterial and irrelevant, and should be excluded. Carefully analyzed, their propositions resolve themselves into the following:—

*First.* The object of the contract is "to insure honesty, efficiency, and economy in the management of the contracting roads."

*Second.* It is beneficial to the Concord Railroad Corporation and its stockholders, because under it "the Concord Railroad is entitled to, and does receive, a larger sum in net earnings than it would receive upon the same business under preceding contracts."

*Third.* "The public receive the benefit of cheaper rates, and a more convenient and more efficient management."

*Fourth.* "The great mass of the business of the Concord Railroad is connecting business with the Boston & Lowell Railroad, and commerce between the states."

*Fifth.* "The present contract is practically identical with" other contracts made, performed, and tolerated between connecting roads, "the legality and expediency of which were never questioned."

The defendants do not contend that the contract is authorized by an express grant of corporate power. An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has a slight or remote relation to it. *Hood* v. *N. Y. & N. H. R. R.*, 22 Conn. 16; *Curtis* v. *Leavitt*, 15 N. Y. 157; *Buffett* v. *T. & B. R. R.*, 40 N. Y. 176; *Beaty* v. *Knowler*, 4 Pet. 152; 2 Potter Corp. 652; Pierce Railroads 515; and authorities cited in former brief. The power which the directors attempted to exercise is not made an incidental one by the fact that their object was "to insure honesty, efficiency, and economy in the management of the" affairs of the Concord Railroad. To them the stockholders intrusted the management of the Concord road, from Concord to Nashua, with its leased lines. This trust was committed to the directors to be personally administered by them, and not to be delegated to others. If they could not discharge this trust honestly, efficiently, and economically, they were bound to surrender it to their masters, the stockholders, instead of delegating it to strangers. Their authority was limited. To them was committed, not the management of the affairs of a road from Concord to Boston, but simply from Concord to Nashua. They were agents or trustees of the stockholders, and in what they did beyond the limit of their

authority they were not agents or trustees of the stockholders, and could not bind them. Their propositions do not assert that the contract was necessary "to insure honesty, efficiency, and economy in the management of the" Concord road.

It is immaterial whether the net income is increased or diminished by the operation of the contract. If the directors had authority to make it, it is valid, even though it largely reduced the income. If they had not authority, it matters not if it double or quadruple the income. The question is one of power, wholly regardless of the beneficial or injurious effects of its exercise. *Davis* v. *Old Colony R. R. Co.*, 131 Mass. 258. The profit resulting from the operation of a contract made by an agent can never be a legal test of his authority to make it. And public benefit can never be secured through a corporate contract not authorized by the charter. The Concord Railroad Corporation is not empowered to allow others to run its road, either alone, or jointly with itself. *Thomas* v. *Railroad*, 101 U. S. 83; Pierce Railroads 514.

Gen. Laws, *c.* 159, *s.* 2, and *c.* 164, *s.* 10, are not repugnant to the constitution or laws of the United States. in relation to interstate commerce. *Veazie* v. *Moor*, 14 How. 568; *State Tax Case*, 15 Wall. 284; *Munn* v. *Illinois*, 94 U. S. 113; *Railway* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & N. W. R'y*, 94 U. S. 164. The three latter cases were decided ten years after the passage of the federal statute on which the defendants rely as bringing this contract within the regulation of inter-state commerce. If that statute releases the Concord Railroad from obedience to the laws of New Hampshire, on the ground that some of its business is the transportation of freight and passengers bound from one state to another, it releases every railroad corporation created by the legislature. They are all engaged in the same kind of business, and each "constitutes a part of a line of railroads extending through several states." The result of their release would be that New Hampshire can create corporations, but cannot govern them; and a person who purchased stock in a road running from Concord to Nashua might awake to find his servants had made him a stockholder in a road running from Quebec to San Francisco. He might further discover that although the road in which he bought stock paid ten per cent. annual dividends, the road in which his servants placed him would pay nothing. Proof that such wrongs have been committed would not make this contract legal.

DOE, C. J.    The private property of the Concord Railroad Corporation, subject to a public right of transportation, is held in trust by the corporation for the benefit of the stockholders. The corporation is trustee, holding the legal title; the stockholders are beneficiaries, holding the equitable interest. The plaintiffs, as stockholders, complain that their interests are endangered and their rights violated by illegal management of the trust property.

*March* v. *Eastern Railroad*, 40 N. H. 548—*S. C.*, 43 N. H. 515; *Zabriskie* v. *C. Railroad*, 23 How. 381, 395; *Hawes* v. *Oakland*, 104 U. S. 450; *Greenwood* v. *Freight Co.*, 105 U. S. 13, 16. The terms of the trust were originally declared in the trustee's charter; and the first question raised by the contract made by the trustee and the Boston & Lowell Railroad Corporation is, What rights of the beneficiaries, and what powers and duties of the trustee, are declared in the charter?

By section 1, certain persons, and their associates, successors, and assigns, are made a corporation, under the name of the Concord Railroad Corporation, and are vested with all the powers necessary to carry into effect the purposes of the charter. The corporation is authorized to locate and construct a railroad, beginning at any point at the southerly line of the state in Hudson, Pelham, or Salem, or beginning at any point in Nashua village, in Dunstable (now Nashua), or between the factories of the Jackson Company in Dunstable, and Merrimack river, so as to enter on the Nashua & Lowell Railroad, paying for the right to use the same, or any part thereof, such a rate of toll as the legislature may prescribe, and complying with such rules and regulations as may be established by the Nashua & Lowell Railroad Corporation, and running northerly to Concord.

Section 2 vests the immediate government and direction of the affairs of the corporation in seven directors, and authorizes but does not expressly require them to choose a treasurer and other agents and servants.

By section 3 the directors are authorized and empowered, by themselves or their agents, to exercise all the powers granted in the charter to the corporation for the purposes of locating and constructing the road, and for the transportation of persons and property thereon, and all such other powers and authority for the management of the affairs of the corporation, not before granted, as may be necessary and proper to carry into effect the object of the grant; to purchase and hold land, materials, engines, cars, and other necessary things, in the name of the corporation, for the use of the road, and for the transportation of persons and property.

By section 5 a toll is granted and established, for the sole benefit of the corporation, upon all passengers and property transported upon the road, at such rates as may be established from time to time by the directors. The road may be used by any person or persons furnishing their own cars, in conformity to regulations prescribed by the directors.

By section 6 the directors are authorized to erect toll-houses, establish gates, appoint toll-gatherers, and demand and receive toll.

By section 16 the corporation has full power to extend its road from the southern line of the state, so as to connect with the Boston & Lowell Railroad, whenever the state of Massachusetts shall grant to the corporation power so to do, with such reasonable conditions as may be required by that state and agreed to by the

stockholders; and for such extension the capital stock may be enlarged by new shares.

The interpretation of this charter, like the interpretation of any other grant, statutory, contractual, or testamentary, is the ascertainment of intention; and the question of intention is a question of fact to be determined upon competent evidence. The general rule is, that a grantor intends, if he is able, to convey those rights and powers without which the grant would be of no effect, or the means reasonably necessary for the enjoyment of the granted property or right, the exercise of the granted power, and the accomplishment of the object of the grant. *Liford's Case*, 11 Co. 46, 52; Broom's L. Max. 362. This rule is applicable to a grant from one person to another (4 Kent Com. 467; *Dunklee* v. *Wilton R. R.*, 24 N. H. 489, 495), to a grant from the people to the government (2 Story Const., *c.* 24), and to a grant from the government to individuals. *Trustees* v. *Peaslee*, 15 N. H. 317, 330, 331; *Downing* v. *Mt. Washington Road Co.*, 40 N. H. 230, 232; 1 Kent Com. 464. "Upon examining the railroad charters in this state, there is as much difficulty to find in them an express authority to the corporation to engage in the business of common carriers, either of persons or property, which is their principal business, as to find such authority to keep warehouses or to receive deposits. From the powers granted by the charter, and the general principles of the common law, it is inferred that they have the power to transport goods and persons. . . . It may be just as readily inferred that they may make any contracts and contract any obligations naturally connected with and incident to their business." *Smith* v. *Nashua & Lowell Railroad*, 27 N. H. 86, 95.

The clause of the Concord Railroad charter, granting all the powers necessary to carry into effect the purposes of the charter, is merely declaratory of the common-law rule of interpretation. If that clause were struck out, the legal meaning of the charter would not be altered. Without that clause, the grantor's intention to authorize the means reasonably necessary for doing what the charter authorized the grantee to do, would be necessarily implied. 2 Story Const., ss. 1237, 1241. Legislation, in affirmance of the common law, is not unusual. *McDuffee* v. *P. & R. R. R.*, 52 N. H. 430, 456, 457. The provision of Gen. Laws, c. 145, s. 5, that corporations not municipal "may make contracts necessary and proper for the transaction of their authorized business, and no other," is an instance. Grave errors in the construction of a statute, general or special, may result from a failure to consider whether some part of it is common law.

The charter of the Concord Railroad Corporation shows that the grantor and grantee intended the grantee's road should be not detached and isolated, but connected with others in a line from Boston to Concord. The grantee was empowered to locate and construct a road, beginning at any point within certain bounds

"so as to enter on the Nashua & Lowell Railroad, paying for the right to use the same, or any part thereof, such a rate of toll as the legislature may from time to time prescribe, and complying with such rules and regulations as may be established by said Nashua & Lowell Railroad Corporation, and running northerly to the town of Concord," and to extend its road "from the southern line of this state, so as to connect with the Boston & Lowell Railroad," when the state of Massachusetts should grant power so to do. The charter authorized the directors to purchase engines and cars, in the name of the corporation, for the use of its road and for the transportation of passengers and freight, and to establish a toll for passengers and freight; authorized any person or persons to use the road, furnishing their own cars; and authorized the directors to erect toll-houses, establish toll-gates, appoint toll-gatherers, and demand and receive toll upon the road. The corporation was a rail-turnpike company, as well as a common carrier. At its northern as well as its southern end its rails were to be open to the car-wheels of any person or persons, the construction of whose wheels, the forms of whose cars, and the weight of whose loads were in conformity to the rules of the road, and who in all things complied with its regulations. Like the harbor of Portsmouth, and the Piscataqua and its navigable branches, the Concord track is a highway, dedicated, upon reasonable conditions, to the freedom of travel and commerce established by state and federal law. The public right of use to which the plaintiffs' private property in the road is subject is a very extensive one. As a reasonably convenient public use of the road as a highway, connecting at its southern end with another highway connecting with another leading to Boston, was the chief object of the charter, it was necessarily intended that the public convenience should be consulted in the working of the road, not merely as a highway between Concord and Nashua, but also as a part of a continuous highway between Concord and Boston. It was not intended to require the public to submit to the unreasonable inconvenience of a change of cars for passengers, baggage, and freight, at Nashua, on the passage, both ways, between New Hampshire and Massachusetts.

There has been no legislation applicable to this case that shows an intention to obstruct travel or commerce by requiring a change of cars on such a line of railway, but the contrary intention has been constantly apparent. Section 10 of c. 142, Rev. St., is, "Any railroad corporation may contract with any other railroad corporation for the transportation of freight or passengers, and the conducting of all business connected therewith on their road." Section 15 of c. 128, Laws 1844, provides that "Such corporations, whenever thereto required by the legislature, shall permit all persons to run locomotives and cars on their road, or may be required by the legislature to draw the cars of such persons with the engines of the corporation on said road, subject to such tolls, rules, and reg-

ulations as the legislature may from time to time prescribe; . .
*Provided*, that when cars and engines are placed by others on the
road, such others shall be liable to pay all damages arising from
their own default or neglect."

Section 8 of *c.* 953, Laws 1850, provides that no contract between
two or more railroad corporations for the use of their roads shall
be legal or binding unless sanctioned in writing by the railroad
commissioners, and approved by the governor and council; that in
no case shall such contract be for a longer term than five years;
and that no such use of another road shall be allowed unless by
contract in writing, executed by both parties, a copy being filed
with the secretary of state.    This section prohibits the use of one
road by the corporate owner of another road, except upon certain
conditions, but does not require each corporation to keep its cars
on, or to exclude the cars of other corporations from, its own road,
nor make the approval of the railroad commissioners and governor
and council essential to the legality of the cars of one road passing
over other roads.    This section is to be read in connection with
*s.* 4 of the same chapter, which requires every railroad corporation
to post up at each of its stations a statement of the whole cost of
freight, and the fare of each passenger between the stations on its
own road and other roads for which it assumes to execute any
agency or joint contract, whether within or without this state.
Thus the act, which in *s.* 8 prohibits the use of one road by the
corporate owner of another road without governmental sanction,
takes it for granted, in *s.* 4, that each railroad corporation may
lawfully assume to execute some agencies and joint contracts in
relation to the transportation of freight and passengers between
stations on its own road and stations on other roads.    Such agen-
cies and joint contracts were not understood to be limited to the
contracts of *s.* 8, which, unless approved by certain state officers,
could not be made by one corporation with another for the use of
their roads.    A contract of *s.* 8, for the use of several roads, for
not more than five years, in writing, executed by the parties, sanc-
tioned in writing by the railroad commissioners, and approved by
the governor and council, a copy being filed with the secretary of
state, was not described in *s.* 4 as any agency or joint contract
which a corporation assumes to execute for another road in rela-
tion to the transportation of freight and passengers between its
own stations and the stations of the other road.    The language of
*s.* 4 is a recognition of a well known usage of railroads, by which
freight and passengers were carried over more than one road upon
a single contract made by one of the roads with the freight-owners
or passengers, without reference to such a contract as is called, in
*s.* 8, a "contract between two or more railroad corporations for the
use of their roads."    "Any agency or joint contract," of *s.* 4, is one
under which each corporation uses its own road, and does not imply
that it uses any other road than its own.    The contract of *s.* 8,

"between two or more railroad corporations for the use of their roads," is a contract under which a railroad corporation uses, jointly or severally, some other road than its own.

By c. 1277, Laws 1852, the first four sections of the act of 1850 are repealed, and reënacted with material amendments. Section 1 requires each railroad corporation to establish and post up in its depots the rates or tariffs of tolls between its stations and the stations of other roads with which it has "a joint business connection for the conveyance of freight and passengers," and requires the rates thus established to "be the same for all persons, and for the like descriptions of freight between such stations." In this change of language there is no alteration of the meaning of so much of the act of 1850 as was applicable to such a case as this. The "joint business connection for the conveyance of freight and passengers," of the act of 1852, does not mean less than the "agency or joint contract" of the act of 1850. The requirement of equality of rates for passengers and freight between the stations of one road and the stations of another with which it has "a joint business connection for the conveyance of freight and passengers," while it does not authorize one corporation to use, that is, to work the road of another, does, by necessary implication, recognize as lawful such a joint business connection (not amounting to a joint or several use by one corporation of another's road) as the public convenience requires.

This provision of the act of 1852, in a condensed form, but without any alteration affecting the sense, is copied in the revisions of 1867 and 1878. Gen. St., c. 149, ss. 1, 2; Comrs. Rep. on Revision of 1867, c. 150, ss. 1, 2; Gen. Laws, c. 163, ss. 1, 2. For thirty-two years a railway corporation has been forbidden, by statute, to work another's road without governmental license. For forty years the legislature have expressly recognized the authority of such corporations to make joint business connections with each other, in pursuance of which passengers and freight could be carried from any station of one to any station of another, without change of cars, upon a single contract made by each passenger or freight-owner and one of the corporations. The distinction is between a corporate carrier, on the one hand, making with passengers and freight-owners contracts of transportation over its own and another's road, and jointly or severally working the other road as well as its own, and such a carrier, on the other hand, making similar contracts, which are executed on the other road by another carrier, in pursuance of a contract, express or implied, between the two carriers, each working its own road.

The commissioners of the revision of 1867 proposed to strike out of s. 8 of the act of 1850 the words "for the use of their roads," and to insert in lieu thereof the substance of the phrase of s. 10, c. 142 of the Rev. St., "for the transportation of freight or passengers, and the conducting of all business connecting therewith on

their road." Comrs. Report, *c.* 151, *s.* 10. This amendment, marked by the commissioners as a substitute materially different from the existing law, the legislature rejected. The prohibition of the use of one road by the corporate owner of another road, was retained (Gen. St., *c.* 150, *s.* 10), with the other provision of the act of 1850, as condensed in the act of 1852, in relation to "a joint business connection for the conveyance of freight and passengers." Gen. St., *c.* 149, *ss.* 1, 2. Here seems to be a very significant legislative act of carefully considered adherence to the distinction between a contract for the use of roads for which a governmental license is necessary, and a joint business connection for which such a license is not required.

The commissioners of revision also proposed another substitute, materially different from the existing law. They proposed another section, which included not only a contract for the use of any railroad, but also a sale, lease, and mortgage of any railroad, and made such sale, lease, mortgage, and contract for use invalid unless in writing, filed in the office of the secretary of state, and authorized by the legislature. Comrs. Report, *c.* 146, *s.* 2. This substitute the legislature adopted, in Gen. St., *c.* 145, *s.* 2; and its adoption, with the retention, in *s.* 10 of *c.* 150, of the clause relating to contract for use (which the commissioners had proposed to strike out of that section), gives two provisions, in different chapters, on the subject of contract for use,—the second, relating to a contract made by two or more railroad corporations for the use of their roads for a time not longer than five years, which must be approved by the railroad commissioners and the governor and council,—and the first, relating to a contract for the use of any railroad, without a limit of five years or other time, which must be filed in the office of the secretary of state, and authorized by the legislature. What is the full extent of the difference between these provisions (*Northern Railroad* v. *Concord Railroad,* 50 N. H. 185–194) we need not now inquire, since there is no difference that has any bearing on the present case, and it is not claimed that the contract in controversy was authorized in the manner prescribed by either of them.

The legality of a joint business connection without a special license is not an open question. In *Nashua Lock Co.* v. *Worcester & Nashua R. R.,* 48 N. H. 339, a New Hampshire railroad corporation was held liable for goods delivered to it to be carried to the city of New York, and lost by the burning of a steamer on Long Island sound. Judge *Perley,* delivering the opinion, says (*pp.* 345, 360, 361, 363),—"We have no hesitation in holding that railroads may contract to carry goods and passengers beyond their own lines. They could not answer the main objects of their incorporation without the exercise of this power. They are laid out and established with reference to connections in business with other extended lines of transportation, and the power to contract for trans-

portation over the connected lines is implied in the general grant of corporate authority. On this point the authorities are nearly unanimous. It has been held otherwise in Connecticut by the opinion of three judges against two. . . . The connected line transacts business as one joint concern, and the business cannot be transacted otherwise with convenience either to the carriers or the owners of the goods. . . . The use of steam in carrying goods and passengers has produced a great revolution in the whole business. The amount and importance of it have of late vastly increased, and are every day increasing. The large business between different parts of the country is done, as in this case, by parties who are associated in long, continuous lines, receiving one fare through, and dividing it among themselves by mutual agreement. They act together, for all practical purposes, so far as their own interests are concerned, as one united and joint association. In managing and controlling the business on their lines, they have all the advantages that could be derived from a legal partnership. They make such an arrangement among themselves as they see fit for sharing the losses, as they do the profits that happen in any part of their route. If, by their arrangement, each party to the connected line is to make good the losses that happen in his part of the route, the associated carriers, and not the owners of the goods, have the means of ascertaining where the losses have happened. And if this cannot be known, there is nothing unreasonable or inconvenient in their sharing the loss, as in the case of a legal partnership, in proportion to their respective interests in the whole route. . . . Few things are of greater importance to the whole country than the cheap, convenient, and safe transportation of goods between distant points. . . . Most of this business is done on connecting lines of railroads and steamboats. . . . The owner of goods must entrust them to these associated carriers; they cannot be carried in any other way. Not only those who are engaged directly in carrying and sending goods are interested in this subject: all who produce and all who consume are interested that goods should be carried as cheaply, as conveniently, and as safely as possible."

This decision affirmed the authority of railway companies of a continuous line to make what is called in the statute "a business connection," under which passengers and freight owners can contract with one of the companies, and safely pay one of them for transportation over all the roads of the associated companies, and under which the companies can divide among themselves the earnings of the joint business. In *R. R. Co.* v. *Pratt*, 22 Wall. 123, 130, the supreme court of the United States said they were not aware that the contrary rule prevailed anywhere except in Connecticut. In *Barter* v. *Wheeler*, 49 N. H. 9, 25–28, this court followed the decision of this point made in *Nashua Lock Co.* v. *Worcester & Nashua R. R.*, and held that in the case of a continuous

line formed by several companies, each operating a part of the line, and empowered by the others to contract for freight over the whole route, and to receive payment for the whole distance, the receipts to be divided among the several companies in prescribed proportions, the companies "stand substantially in the position of partners in such through business." The associated carriers of that case formed a transportation line from Boston, through Nashua, Concord, Vermont, New York, and various ports of the Western lakes. In any view that can be taken of the present case, it is enough that the doctrine of corporate power, laid down in *Nashua Lock Co.* v. *Worcester & Nashua R. R.,* is the law of Massachusetts and the federal court as well as of New Hampshire. *Najac* v. *B. & L. R. R. Co.,* 7 Allen 329, 333 ; *Hill Mfg. Co.* v. *B. & L. R. R. Co.,* 104 Mass. 122, 133 ; *Railway Co.* v. *McCarthy,* 96 U. S. 258, 266 ; *Ins. Co.* v. *R. R. Co.,* 104 U. S. 146, 157 ; Pierce Railroads 508.

The corporate obligation has a material bearing upon the business connection that may be formed by the companies of this line. Chapter 1113, Laws of 1851, provided that in all cases where railroads were unable to agree upon terms of connection, or on referees to whom the same might be submitted, either road might apply to the court for the appointment of referees to adjust and determine all matters of connection between such roads. This act was repealed by *c.* 1666, Laws of 1855, which provided that every railroad corporation should draw over its road the cars, passengers, and freight brought to it by any other railroad which is authorized to unite with or enter upon and use the same, as well as also all cars, passengers, and freight destined for such railroad, for a reasonable compensation ; that no railroad, drawing the cars of other roads, should be required to allow its road to be used by any other motive power than its own ; and that, if the roads could not agree as to the reasonable compensation, either party might apply to the court for the appointment of referees to adjust and determine the rates of compensation for transportation, and all matters of connection between such roads. Chapter 1847, Laws of 1856, so amended the act of 1855 as to give the benefits of it to connecting railroads, notwithstanding neither of them was authorized by law to unite with or enter upon and use the other. In the revision of 1867, by a change of the statutory language supposed by the commissioners to be material, the right to obtain, by a compulsory reference, an adjustment of the rates and terms of such transportation and all matters relating to the connection in future, was limited (if the language of *s.* 1 of *c.* 150 of the revision is to be taken literally, and is to control the next eight sections of the chapter) to cases in which one railroad is authorized to enter on and use the road of another company. It is not necessary in this case to inquire whether the act of 1856 was limited in the revision, because the charter of the Concord Railroad brings that company

and the Nashua & Lowell company within even the most narrow construction of the revised law now in force.  G. S., *c.* 150; G. L., *c.* 164.  The charter of the Concord Railroad authorized that corporation to locate and construct its road, beginning at any point within certain limits, so as to enter on the Nashua & Lowell Railroad, paying for the right to use the same or any part thereof, and complying with the rules of that road.  If the two companies are unable to agree upon the terms of connection, either may apply to the court, upon Gen. Laws, *c.* 164, *s.* 3, for the appointment of referees to adjust and determine the rates and terms of transportation on the New Hampshire portion of the Nashua & Lowell road, and all matters relating to the connection of the two roads.  And, whatever may be the limitations of such compulsory arbitration between other roads, this judicial power of adjusting and determining all matters relating to the connection of these two roads must be very broad, because it was the intention of the legislature that both the New Hampshire part of the Nashua & Lowell road and the Concord road (located and constructed so as to enter on the Nashua & Lowell) should be parts of a public road extending from Concord to Boston; and the provision for a compulsory adjustment and determination of all matters relating to the connection of the parts furnishes a means of requiring the parts to be so worked as to give the public many, if not all, of the practical conveniences of one road to the extent of New Hampshire jurisdiction.

It was not intended that while the Concord could enter on and use the Nashua & Lowell, and obtain a compulsory adjustment of all matters relating to the connection of the roads, the Nashua & Lowell should have no other rights of connection with the Concord than such as the Concord might grant.  An adjustment of all matters relating to their connection would require a consideration of public rights, and public convenience, and the duties of both roads to the public.  It was not the intention of the legislature, that, while the Nashua & Lowell might be required to draw over its road the cars of the Concord, the latter could not be required to draw over its road the cars of the former.  It was the intention that the Concord might obtain, by compulsory arbitration, an adjustment of the connection of the two roads upon such grounds of convenience, efficiency, and economy as would promote the interest of the public in whose service the corporations are employed, with due regard for the interests of both corporations, and in strict conformity to the limitations of their powers.  Such an adjustment might require much reciprocity and unity of action in the two corporations, each working its own road, to enable them to render the transportation service which is due to the public, and which New Hampshire authority would endeavor so to control for the public accommodation as to give the public substantially such a service as would be received from a single corporation, or a

partnership of corporations, working the road between Concord and Boston. Nothing less than such a service can amount to the reasonably convenient use of that highway to which the public are entitled.

And if the Concord were not expressly authorized by its charter to enter on and use the Nashua & Lowell road, and if *ss.* 1 and 2 of *c.* 163, Gen Laws, did not recognize the validity of business connections of railroads, and if *c.* 164 had not provided a method of compulsorily adjusting the business connection of the Concord and the Nashua & Lowell, we should not be prepared, upon such consideration as we have been able to give the subject, to say that there was such a defect of corporate powers, or such a defect of public rights or remedies, that these companies could not be compelled to make with each other a convenient and economical business connection. It may be found, should this point ever be presented for consideration, that as these roads, running, the one from Nashua north to Concord, and the other from Nashua south to the Massachusetts line towards Boston, are highways, authorized to be located and constructed for public use, there is, by necessary implication, a judicial power of compelling the corporations to work them as parts of a continuous line, in such a business connection as is required by the reasonable necessities of public convenience and public economy. In the public character of railways, and the public purpose for which railway corporations are created, is included an extensive public right of convenient and economical use, for the enforcement of which the common law may afford more adequate methods than there has been occasion in this state to employ.

The right of way can be taken for public railways and other highways without the land-owners' consent by the public, acting through public agents, and exercising the public power of eminent domain. The right of way can be compulsorily taken only by the public. It can be thus taken by the public only for public use. The public use for which it is taken is a reasonable use; and what is a reasonable use is generally a question of fact depending upon the circumstances of each case. *Varney* v. *Manchester,* 58 N. H. 430. When the right of way is taken for several railroads as parts of a continuous line, the corporations which accept the duty of providing for the reasonably convenient and economical public use of the line fail in this duty if they do not make, between themselves, the business connection necessary for such use, as a town would fail in its duty if it allowed an ordinary town road, part of a line of roads through several towns, to be defective at its junctions with other parts of the line. The duty is the same, whether the public right of way is acquired with or without the consent of the land-owners. And, in the absence of all express statutory remedy for such a neglect of duty, it would seem there must be ample remedies at common law. Where there is a legal

right, public or private, and no statutory remedy, the common law generally furnishes an adequate remedy by appropriate process of law or equity. And in case the Concord and Nashua & Lowell companies should neglect their duty of making a business connection as economical, convenient, and efficient as the public have a right to demand, it would be strange if the judicial introduction of numerous forms of action and process during the last one or two thousand years had so exhausted the resources of the common law that it could no longer produce the simple remedies needed for the maintenance of such an ordinary prerogative as the public right of reasonable use of connected highways.

On the question of the existence of legal remedy, it would be immaterial whether the duty of providing for the reasonable public use was imposed upon towns or other corporations, or whether, in the connected highways, carriages were drawn by animal or steam power, on rails or on the ground. Although a compulsory arbitration for adjusting all matters relating to the connection of the Concord and the Nashua & Lowell roads is provided by c. 164, only on the application of the proprietors of a railroad, it does not necessarily follow that the public have, under existing law, no means of obtaining a business connection of these roads as economical, convenient, and efficient as the public have a right to enjoy. It may not be easy to show how, by some peculiar and newly discovered misfortune, the remedy-producing power of the common law, so often and so vigorously exercised in former times, has been lost in our day.

The limits of the business connection which the Concord and the Nashua & Lowell corporations may, by statutory or common-law process, be compelled to adopt for the accommodation of the public and of each other, need not now be determined. It would seem that they may, by agreement, without governmental license, form such a business connection as, by legal process, may be forced upon them in case they are unable to agree; that they may waive the benefit of s. 2, c. 164, which provides that no proprietors of any railroad over which the cars of other railroads are drawn, in conformity to the preceding section, shall be required to allow their road to be used by any other than its own motive power; and that they may, by agreement, adopt, or, by legal process, be compelled to form, a connection, under which, with the assent of Massachusetts, and of the proprietors of the Massachusetts roads between Boston and Nashua, trains may be run between Boston and Concord without change of cars, engines, or trainmen. We are not prepared to say they cannot be joint owners of rolling stock so run (Olcott v. Tioga R. R., 27 N. Y. 546, 560), the fuel and oil used in running it, and a Nashua junction station, occupied by a ticket-seller, baggage-master, and other agents employed by the Concord and the Nashua & Lowell companies. Rolling stock and buildings that may be jointly owned may be jointly built and

jointly repaired.   The legal extent of a connection, formed either
by agreement of the parties, or the compulsory action of the
authorities of the states under existing law, in pursuance of which
the seventy-six miles of rail highway between Boston and Concord
may be or should be operated, we now undertake to explore so far
only as a general view of it is necessary for an understanding of
the present case, and for a consideration of the question whether
the connection of which the plaintiffs complain exceeds the legal
limit.

By the contract of the Boston & Lowell and the Concord, both
companies, as partners, work the whole road between Boston and
Concord.   For every legal and practical purpose, and in every
legal and practical sense, the Boston & Lowell uses the Concord
road as it uses the rest of the line, and the Concord uses the rest
of the line as it uses its own road.   As principals, they jointly
work the whole line, and as principals they divide the net profits.
Nothing is wanting to complete the partnership.   *Eastman* v.
*Clark*, 53 N. H. 276; *Berthold* v. *Goldsmith*, 24 How. 536; *Beau-
regard* v. *Case*, 91 U. S. 134, 140.   If the contract in its present
form is not a general partnership contract for working the whole
line, there are no stipulations capable of making it such a contract
that can be added to it.   A clause could be inserted, assuming to
convey to both parties all the corporate property, rights, and pow-
ers of each.   Such a conveyance would aim at a certain amalga-
mation, but would, if valid, add no necessary legal element of
partnership to the arrangement for operating the roads.   A clause
could be inserted, requiring each to contribute its share of defi-
ciency if the losses and expenses of operation should be more than
the gross earnings.   But such a stipulation is implied from the
agreement, that, as joint principals, they work the line and divide
the net profits.

Authority to enter into such a partnership is not granted to the
Concord Railroad Corporation by its charter or any other statute,
unless such authority is necessary to carry into effect the purposes
of the charter.   That corporation has not the legal capacity either
to work the Massachusetts portions of the line as a partner with
the Massachusetts corporation, or to admit the latter as a partner
in working the Concord road, if the partnership is not a reason-
ably necessary means of exercising corporate powers shown to
have been granted.   Its power of partnership must be an instru-
mental power, reasonably necessary for accomplishing the objects
of the corporate existence.   The general proposition, that the cor-
porate owners of the line between Boston and Concord can make,
and should be compelled to make, such a business connection of
their roads as will practically give the public many, if not all, of
the advantages of a general partnership of the owners, is to be
taken with the general qualification, that, in the absence of a spe-
cial governmental license or authority for one to work and man-

age, jointly or severally, another's road, each corporation must be sole principal in working and managing its own road. Whether there can be facts requiring a further modification of the general proposition, or a modification of the general qualification, we do not determine.

If the directors of the Concord Railroad should vote to build a line of telegraph on its road from Nashua to Concord, and stockholders should ask an injunction against the execution of the vote, one question would be whether a telegraph line is reasonably necessary for working the road, and carrying into effect the purposes of the charter. It would be largely, if not wholly, a question of fact: and by proof, agreement, statement, or judicial observation, the facts on which the merits of the question must be decided would need to be brought to our official knowledge. The defendants, contending that a similar question of reasonable necessity arises in this case, have made a written statement of facts, in sixteen propositions, which they offer to prove. And the question arises whether the facts thus stated show a reasonable necessity for the partnership. This question must be answered in the negative. The facts stated do not show that substantially all the public and private advantages of the partnership cannot be attained by a business connection in which each corporation works and manages its own road. The defendants say the local business of the Concord road is a small part of its whole business; that the great mass is connecting business. This is immaterial on the present question. If the Concord road had no local business,—if its entire business were the transportation of passengers and freight, carried between Boston and Chicago or San Francisco, without change of cars, and without a stop at any intermediate point,—that state of things would not show a reasonable necessity for an instrumental power of the Concord company to jointly work its own road, and the rest of the line, as a partner with other corporations. If its road ran through an uninhabited country, and it did a vast business of transportation exclusively between other states or foreign countries, a partnership of this company with others in the working of its road, and the rest of the line in other states or countries, would not, on that account, be necessary to carry into effect the purposes of such a grant as its present charter.

The defendants say, that in the necessary connection of their roads as parts of the line between Boston and Concord there must be a great variety of business matters that cannot be adjusted upon exact computations, and that the local business cannot be so distinguished and separated from the connecting business that the expenses of each can be ascertained. If it be so, such difficulties are not obviated by the partnership. Expenses and earnings of the companies, by their business connection necessarily so mixed that the share of each cannot be identified and separated from the rest by a precise method, must be divided by some method that is

not precise.   What cannot be done by book-keeping must be done in some other way.   If a comprehensive estimation is the only available means of adjustment, the parties must resort to such estimation.   The law does not require what is impossible.   But an inevitable hotchpot of expenses, losses, or earnings, that can be divided by the companies working the whole line as partners, can be divided by the same companies, each working its own road. If, by a proper business connection, each working its own road, the parties must have a mass, small or large, of expenses, losses, or earnings which it is impracticable to divide by any other method than the application of some measure of percentage adopted upon a general estimate, the only practicable method of division is the only one required by law.   The necessity of a general estimate, or a general rule of average or proportion, for dividing property the identity of which is lost by fusion. is not a necessity for this partnership.   The subjection of the plaintiffs to such a partial union of interests as unavoidably results from a necessary business connection of this line of roads, does not practically transform them from stockholders of the Concord road into stockholders of the whole line, compelled to exchange a large part of their interest in all the earnings, expenses, losses, and risks of the Concord. for an interest in all the earnings, expenses, losses, and risks of the rest of the line.

The defendants say that under the present contract the net earnings of each road will be increased by the economical management and working of each road, and the public will receive the benefit of cheaper and more convenient and efficient transportation.   But the defendants do not state any facts going to show that substantially all the increase of net earnings and public benefit would not result from a proper business connection not amounting to a general partnership.   While the public have a right of use, reasonably economical, convenient, and efficient, the plaintiffs, as stockholders, have legal rights which cannot be sacrificed for cheaper transportation, or other public advantage.   A mere fact of profit or loss, while it may be a fact of great interest to the stockholders and the public, is not the legal test of corporate power. There are many partnerships and enterprises in which, however profitable they might be for the Concord company and the public, that company cannot engage.   There does not appear to be any conflict of interest between the plaintiffs and the defendants, or between either of them and the public.   The plaintiffs, the defendants, and the public are interested in having an economical, convenient, and efficient business connection of the line of roads from Boston, through Nashua, to Concord.   The defendants' statement of facts does not show that such a connection, without the general community of interest and management established by their contract, will not give the plaintiffs, the defendants, and the public all the practical advantages of the partnership.

The defendants say, in general terms, that under their contract the rights of the stockholders of the Concord Railroad are more fully protected, and the rights of the public better subserved, than they have ever been under any preceding contract, or can be under any arrangement which does not substantially embody its provisions. If the business connection of this line of roads has not been what it ought to be, it is the duty of the companies to improve it; but the mere need of improving their business connection does not prove the need of this partnership. By the statement that the contract is better for the stockholders and the public than any arrangement that can be made which does not substantially embody its provisions, we do not understand the defendants mean that a general partnership is essential. In its printed argument the Concord Railroad says, "By the terms of the contract, the idea of amalgamation, consolidation, or partnership is expressly repudiated."

It is argued that as the directors of two connecting roads may severally appoint the same person superintendent or manager of each road, and the stockholders of each company may elect the same directors, there can be no legal objection to the stipulations of this contract, which provide for a joint management. The stockholders of each company can elect the same directors, and the directors of each can, to some extent, employ the same persons as agents and servants of each; and, without any evidence, there would be a presumption of fact that, to some extent, the same persons ought to be so employed. The directors of one road may employ one person because, being a suitable person, he is employed by the directors of connecting roads. In many matters of management, the directors of one road may take a certain course because, being a proper course, it is taken by the directors of other connecting roads. The business connection which it is the duty of the companies of this line to form, undoubtedly requires much harmonious and united action on the part of the directors of the several roads. But in the facts stated by the defendants, no necessity appears for the Concord directors being bound by contract to the concurrent action of partners in the choice of a general manager of all the roads, or in the "control over the management" of all the roads, or in the division of the net profits of all the roads. By the ninth article of the contract, the roads must be operated and managed by a general manager chosen by the concurrent vote of a majority of the directors of each of the contracting parties, and removable in like manner, or by the unanimous vote of either board. The manager is not the agent of the Concord company alone for operating the Concord road, and of each of the other companies alone for the several management of the road of each. He is as much the agent of the Boston & Lowell company for managing the Concord road, and of the Concord company for managing the Boston & Lowell road, as of the Concord company for

the management of its road.    He is a partnership agent for a general partnership management of all the roads.    The same person may, of course, be chosen by the directors of each company, and vested with large powers of agency for the several management of each road.    And he may exercise his powers for carrying into effect the business connection which it is the duty of the companies to form.    But the facts stated by the defendants show no reason why he should not be exclusively the agent of the Concord company in working its road, and exclusively the agent of each of the other companies in working its road.    Whatever difference of fact there would be in the work he would do, or his manner of doing it, there is a broad legal distinction between his working each road as the agent of its corporate owner, and his working each road as the agent of the corporate owners of all the roads united in this general partnership; and there is a broad legal distinction between his being elected, under a general partnership contract, by the members of the firm acting as such, and his being elected by each corporation, not acting as a member of a firm, and not acting under the legal obligation of a contract to submit his election to another corporation for confirmation.

The directors of the Concord Railroad are authorized by its charter to elect such agents and servants as are necessary for doing the work of the corporation.    They may exercise this power in such a manner as not only to accomplish the object of working the Concord road as a highway between Concord and Nashua, but also to accomplish the object of working it as part of the highway between Concord and Boston.    But this elective power is a fiduciary one, and the general rule is, that fiduciary power cannot be delegated by the trustee.    *Wilson* v. *Towle*, 36 N. H. 129, 138. An executor, guardian, or selectman has no more authority to appoint a joint principal and official partner, and share with him the powers and duties of his trust, than to convey them entirely away.    If a trustee could convey a portion of his fiduciary responsibilities to a partner selected by himself, he could alienate them altogether, and furnish an official substitute.    *W. Mills* v. *Upton*, 10 Gray 582, 596, 597 ; *Thomas* v. *R. R. Co.*, 101 U. S. 71, 80, 83, 84.    There is a wide legal difference between a trustee exercising his fiduciary powers on his own responsibility, seeking and acting upon the information and advice which his judgment demands and approves as a ground of action, and a trustee taking a partner as a joint principal in the execution of the trust.    There is a wide difference between a Concord Railroad board of directors consulting the directors of another road as to the appointment of a Concord Railroad manager, and other matters, but retaining and exercising their undivided powers of appointment, removal, and management, and a Concord Railroad board making a contract of fiduciary partnership with the directors of another road, and sharing with them the powers and duties of the Concord company.

No reason appears why the trainmen, employed on a through train between Concord and Boston, should not be exclusively the servants of the Concord company while the train is on the Concord road. They may, of course, be employed by a single person who is Concord manager in the working of the Concord road, and manager of each of the other roads in the working of each. No reason appears why each corporation should not severally work its own road by its own agents and servants, many of whom may be severally employed by all the companies of the line, and paid by one agent, similarly employed, out of one fund conveniently provided for the purpose.

In some important respects, the difference between a business connection in which each company is sole principal in working its own road, and this general partnership in which each company is a joint principal in working all the roads, may be more a difference of law than of fact. In other respects, and especially in the general result, the practical difference may be material. It is not a matter of statute or common law, and it is not a matter of fact settled by any natural law of chance by which the legal rights of the plaintiffs can be determined, that, under this partnership contract, a series of losses on the Massachusetts part of the line would not exceed the profits of the whole line, and leave the plaintiffs for a time without dividends. Without the partnership, a series of losses on the Concord road might for a longer time deprive the plaintiffs of dividends, which, under the partnership, they might receive out of the profits of the more fortunate Massachusetts section, notwithstanding such losses. Without the partnership there are risks for the stockholders of each part of the line. No legal reason appears for compelling the plaintiffs to exchange their share of the risks of their own road for an equal or greater or less share of the risks of the whole line. Certain risks beyond their own road the plaintiffs may be obliged to incur as a consequence of the business connection which it is the public duty of the corporations to form. If through freight or through baggage is lost on the line, and it cannot be ascertained on which part of the line it was lost, the associated companies may share the loss as they would in the case of a partnership. *Nashua Lock Co.* v. *Worcester & Nashua R. R.*, 48 N. H. 339, 361. In this way each company may incur a risk of losses happening on the roads of the other companies. But the necessity of incurring such a risk is not a necessity of incurring all the risks of this general partnership. If the Concord stock now owned by the plaintiffs could, by this partnership contract, be subjected to the risks of the whole line for five years, there is no limit of the time for which it could, by successive contracts, be subjected to the same risks.

We do not need to be informed by witnesses that this line of seventy-six miles can be more cheaply worked as one road than as several roads. And argument is not necessary to convince us that

a cheap working of the line can be and ought to be useful to the stockholders in the security of their stock and dividends, and useful to the public in low prices of transportation.   But our conclusion upon the whole case is, that the facts stated by the defendants are not a defence, and that the plaintiffs are entitled to an injunction against the performance of the contract, because it is the formation of a general partnership, and, for aught that appears in those facts, substantially all the public and private advantages of economy, convenience, and efficiency which the contract was made to secure can be obtained by such a business connection, not a general partnership, as it is the duty of the directors of the several parts of the line to form.

*Injunction granted.*

All concurred.